# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### December 8, 2004 Session

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES
## v. M. P., ET AL.

**Appeal from the Juvenile Court for Putnam County**
**No. 686-DCS     John P. Hudson, Judge**

---

**No. M2004-01976-COA-R3-PT - Filed February 17, 2005**

---

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

<u>AND</u>

## IN THE MATTER OF:  M. R.

**Appeal from the Circuit Court for Putnam County**
**No. 03N0451     John J. Maddux, Jr., Judge**

---

**No. M2004-01692-COA-R3-JV - Filed February 17, 2005**

---

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

Two cases that pertain to the same child are consolidated on appeal.  The child was placed in custody of the Department of Children's Services at the age of two and one-half years due to filthy conditions at home, lack of supervision, exposure to pornography and drug paraphernalia and parents drug use when both parents were arrested at the family's home.  The Juvenile Court found the child to be dependent and neglected and a victim of aggravated sexual battery.  Parents appealed and received *de novo* trial in Circuit Court which separately concluded the child was dependent, neglected and a victim of severe child abuse and sexual battery.  In a separate action, DCS petitioned the Juvenile Court to terminate both parents' parental rights.  DCS investigator interviewed the mother while she was in custody on unrelated charge and after the mother had been appointed counsel.  The DCS investigator had not consulted with nor been encouraged by DCS attorneys about questioning the mother.  After being released from custody the mother was interviewed by detective.  After being advised of her Miranda rights she signed a statement waiving the rights and admitted that she and

the father sexually abused the child. The mother had been apprised of her rights against self-incrimination, yet she made a voluntary statement. Thus, she waived her rights against self-incrimination. Juvenile Court terminated the rights of both parents based on abandonment, persistent conditions, and severe child abuse. Both parents appeal. We affirm.

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., concurred. WILLIAM B. CAIN, J., concurred in the results.[1]

Edwin John Mackie, Jr., and Martelia T. Goff Crawford, Cookeville, Tennessee, for the appellants, M.P. and T.R.

Paul G. Summers, Attorney General and Reporter; and Juan G. Villaseñor, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

John Philip Parsons, Cookeville, Tennessee, guardian ad litem.

## OPINION

A dependency and neglect action and a termination of parental rights action are consolidated on appeal as each pertains to the same parents and child. The pertinent facts in each case are largely the same.

On May 27, 2003, when the child was approximately two and one-half years old,[2] a deputy with the Putnam County Sheriff's Department went to the family home to serve a warrant on the father. The deputy observed the child alone in a field near a hay bale. The mother came outside and inquired as to the purpose of the visit. While the deputy was trying to determine whether the father was at the home, the mother motioned to someone in the house and said, "Run." The father was later found hiding on the second floor of the home and placed under arrest. The mother was arrested for helping the father evade arrest.

The deputy testified that he observed the child drink milk from a "sippy" cup and then spit it out. The deputy heard the mother tell the child not to spit out the milk, but to drink it. When the deputy picked up the child, he noticed that the child was dirty, wearing a dirty diaper, had matted hair, was not wearing shoes, and smelled of spoiled milk. When the deputy opened the sippy cup, he found it to contain spoiled milk and the lid was covered in green mold.

---

[1] See separate concurring opinion in *In re A.T.S.*, No. M2004-01904-COA-R3-PT, 2005 WL 229905 (Tenn. Ct. App., Jan. 28, 2005)(dissenting with that portion of the majority opinion concerning the standard of review and the interplay of the clear and convincing evidence standard with the preponderance of the evidence standard) and *Estate of Acuff v. O'Linger,* 56 S.W.3d 527, 533-37 (Tenn. Ct. App. 2001), perm. app. denied (Tenn. October 1, 2001).

[2] The child was born in October 2000.

DCS was called to assist the child because both of the child's parents were taken into custody. DCS promptly sent Tracy Plant to the home. She went into the home to locate diapers for the child. She requested that deputies accompany her because there was another "wanted" individual thought to be in or around the home. The deputies and Ms. Plant observed extremely filthy and hazardous conditions in and around the home. The yard was filled with debris, metal, garbage, junk cars, car parts, wires, and bottles. Many dangerous items such as a wood maul and meat cleaver were found in areas within the child's reach. On a makeshift table was a substance that appeared to be marijuana, a pipe, and rolling papers – all within the child's reach. Inside the home was cluttered and filthy. Pornography, drug paraphernalia, plates of uneaten molding food, and layers of trash and debris littered the home. In some rooms wiring was exposed. What appeared to be a used condom was found on top of a child's coloring book. On a coffee table in the living room, deputies found a video cover depicting sexually explicit acts. Deputies later testified that when the child saw the video cover, he stated "Daddy, jack me off."

Ms. Plant took numerous photographs documenting the deplorable conditions of the home, both inside and out. When interviewed at the scene, the mother stated that if drug tested, she would test positive for marijuana and hydrocodone, and admitted taking hydrocodone earlier in the day and smoking marijuana with the father. The mother also stated that the father's brother had stayed in the home and had used cocaine while he was there. The father admitted that he, too, would test positive for hydrocodone and marijuana, but that he had a prescription for hydrocodone.

The child was taken to the emergency room to be checked for drug exposure. While at the hospital, he was bathed by Ms. Plant who noted that even after being bathed, he still had a foul odor. The child did not, however, appear to have any physical injuries.

On May 29, 2003, counsel was appointed for the mother and father. The next day, Ms. Plant interviewed the mother and father in the Putnam County Jail. Notice was not given to the parent's counsel. Because of statements the child made in response to the video tape cover, DCS was concerned that the child had been sexually abused. During the May 30 interview, the mother stated that the child could have picked up such language by hearing his parents have sex and that the pornographic movie contained that exact language. During the June 3 interview with Ms. Plant, the mother admitted exposing the child to pornography, indicated that the child knew the names of sex acts from observing pornographic magazines, that the parents engaged in sex while the child was present, and that the mother had sex with the father's brother while the child was present. The mother admitted that she involved the child in sex acts between herself and the father. Specifically, the mother stated that the child would touch her vaginal area with his hands and orally stimulate her breasts and that she would touch the child's penis and buttocks. The mother denied performing oral sex on the child or asking the child to perform oral sex on her. She also denied penetrating the child.

On June 6, 2003, the mother was interviewed by Detective Gary Roach. Her attorney was not notified. She gave Detective Roach a written statement similar to the admissions made to Ms. Plant. She signed the statement as well as an acknowledgment that she had read the statement of Miranda rights, that she understood the Miranda rights, that she did not want a lawyer, that she

understood what she was doing and had not been pressured, forced or coerced into making the statement.

On June 17, 2003, the DCS case manager prepared a permanency plan, pursuant to which the parents were to: (1) maintain a sanitary and safe home for six consecutive months, (2) not allow people into the home who would not keep the home safe and free of drugs and alcohol, (3) undergo an alcohol and drug treatment and assessment and follow recommended treatment, (4) undergo a parenting assessment, attend parenting classes, and participate in Home Services, and (5) submit to a psychological and psychosexual evaluation. The mother and father refused to sign the plan, purportedly on the advice of their counsel. The case manager scheduled psychological and psychosexual evaluations for both parents but both parents refused to be evaluated even though DCS obtained funding for the evaluations.

The DCS case manager, Ms. Sprowl. visited the home on June 9, 2003, and noted that a nominal, but inadequate effort had been made to clean the home. When she attempted a home visit on August 12, 2003 she was denied access, but noted that the outside of the home was actually in worse condition. The case manager drove by the home on April 6, 2004, and again on June 21, 2004, and noted that the outside of the residence remained in a deplorable condition.

The child's foster mother testified that the child has exhibited inappropriate sexual conduct on several occasions since he had been in her care. These instances include wanting to watch her take a shower, attempting to touch the foster mother and her husband in private areas such as the crotch and breasts, requesting to kiss the dog's hind quarters, and instances of sexually oriented behavior with a doll. In one instance, the child's sexually inappropriate conduct was so persistent that the foster mother had to remove the child from church.

**Procedural History**

DCS filed a Petition for Temporary Custody of the child on May 29, 2003, in the Juvenile Court alleging the child was dependent and neglected. The Juvenile Court awarded temporary custody to DCS after finding probable cause to believe that the child was dependent and neglected. On June 16, 2003, DCS filed an Amended Petition for Temporary Custody seeking a finding by the court that the parents had committed severe child abuse against the child. On December 22, 2003, the Juvenile Court concluded *inter alia* that the parents had committed severe child abuse, that the child was a victim of aggravated sexual battery by his mother, that DCS was relieved of making reasonable efforts to reunify the family, and that any and all contact between the parents and the child be terminated immediately.

The parents appealed this ruling to the Circuit Court and received a *de novo* trial. During the dependency and neglect proceedings before the Circuit Court the admissions of sexual abuse by the mother to Ms. Plant and Detective Roach were excluded. The court allowed DCS to make an offer of proof, but noted that it would not consider these admissions in making its ruling. On April 6, 2004, the Circuit Court found by clear and convincing evidence that the child was dependent and

neglected and a victim of severe child abuse and aggravated sexual battery perpetrated by his parents. The Circuit Court also ruled that DCS was relieved of its efforts to assist the parents in providing a suitable home for the child.

DCS filed a petition to terminate parental rights on November 11, 2003. The Juvenile Court terminated both parents' parental rights on the grounds of abandonment, persistent conditions and severe child abuse on June 29, 2004.

## Standard of Review

A finding of dependency and neglect must be based on clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c). Review of the trial court's findings of fact are *de novo* upon the record of the trial court accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn R. App. P. 13(d)**,** *State v. Conaster*, 1990 WL 15540, * 3 (Tenn. Ct. App. Feb. 23, 1990)**.** There is no presumption of correctness with respect to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn.1996) and Tenn. R. App. P. 13(d).

Proceedings to terminate parental rights are statutory. Parties seeking to terminate a parent's rights with regard to his or her child must prove two things. They must prove the existence of at least one statutory ground for termination.[3] Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Additionally, they must prove that terminating the parents' rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *In re A.W.*, 114 S.W.3d 541, 545 (Tenn. Ct. App. 2003); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). The factors to be considered in a "best interests" analysis are set forth in Tenn. Code Ann. § 36-1-113(i).

Persons seeking to terminate these rights must prove the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re A.W.*, 114 S.W.3d at 545. Evidence that satisfies the clear and convincing evidence standard eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the propositions sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000).

As a consequence of the clear and convincing burden of proof standard, this Court found it necessary to adapt Tenn. R. App. P. 13(d). *In Re Adoption of Muir*, No. 2002-02963-COA-R3-CV, 2003 WL 22794524, *2 (Tenn. Ct. App. Nov. 25, 2003) explained the adaptation in detail.

---

[3] The statutory grounds for terminating parental rights are found in Tenn. Code Ann. § 36-1-113(g).

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-1139(c), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the biological parent's parental rights. *Jones v. Garrett*, 92 S.W.3d at 838; *In re Valentine*, 79 S.W.3d at 546; *Ray v. Ray*, 83 S.W.3d at 733; *In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *5 (Tenn. Ct. App. Sept. 6, 2001), *perm. app. denied* (Tenn. Dec. 27, 2001).[4]

*In Re Adoption of Muir*, at *2.

## Issues

The parents present three issues: (1) Whether DCS proved by clear and convincing evidence that the child was dependent and neglected pursuant to Tenn. Code Ann. § 37-1-102(b)(12); (2) Whether DCS proved by clear and convincing evidence one or more grounds sufficient to terminate their parental rights; and (3) Whether the trial court erred in the proceeding to terminate parental rights by admitting the mother's statements regarding sexual abuse of the child without her appointed counsel being present. DCS contends that the Circuit Court erred by excluding the mother's omissions of sexual abuse in the dependent and neglect proceeding.[5]

## The Dependent and Neglected Action

The Circuit Court found that the child was dependent and neglected pursuant to Tenn. Code Ann. § 37-1-102(12)(B), (F) and (G). In pertinent part, the statute provides that "dependent and neglected child" means a child:

---

[4] These decisions draw a distinction between specific facts and the combined weight of these facts. Tenn. R. App. P. 13(d) requires us to defer to the trial court's specific findings of fact as long as they are supported by a preponderance of the evidence. However, we must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion. The Tennessee Supreme Court used this approach in *In Re Valentine* when it recognized the difference between the conclusion that a biological parent had not complied substantially with her obligations in a permanency plan and the facts relied upon by the trial court in support of this conclusion. *In Re Valentine*, 79 S.W.3d at 548-49; *see also Jones v. Garrett*, 92 S.W.3d at 838.

[5] The same admissions were admitted in the termination of parental rights action over the objections of the parents.

-6-

(B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;

(F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;

(G) Who is suffering from abuse or neglect;

Tenn. Code Ann. § 37-1-102(12). The court based its decision on the lack of supervision of the child, child's lack of hygiene, child's consumption of spoiled milk, the filthy, unsanitary and hazardous condition of the home, and yard, parents admitted drug use, child's exposure to the pornographic and obscene video cover, and child's sexualized statements in response to seeing the video cover.

The parents argue they are poor, with poor housekeeping skills and that the evidence that they simply have a dirty home is insufficient to meet the burden of clear and convincing evidence required to show dependency and neglect. While the parents agree the DCS caseworker's photographs clearly indicate that the home is dirty, they argue that the child, other than being dirty, was found to be in good health, that no medical records were presented showing hospital visits or any injuries requiring treatment, and that there was no evidence in the record of prior injuries.

The parents attempt to dilute the images and testimony of the filthy and obviously hazardous conditions of the home by arguing that there is not enough testimony or enough photographs to prove that a hazardous situation is actually present. For example, parents argue that while there was a maul laying on the ground, there was no proof that it was sharp or that the child could have picked it up, that while there was testimony about broken glass, screws and nails on the ground, the investigator could not point out such articles in the photographs she took. Parents assert that there was no proof that the child was in any danger of substantial risk of harm or that the child was unsupervised and that it is not uncommon for a child playing outside to be dirty or to have a dirty diaper. Parents assert that there is no proof in the record to show that the child was exposed to pornography other that the child being brought back into the home and reacting to a pornographic video tape cover.

DCS argues that the court was correct in finding the child was dependent and neglected and a victim of severe child abuse given the proof as to the deplorable living conditions at the home and the fact that the child was at great risk of bodily harm because of the conditions. Further, DCS argues that the court was correct in finding that the mother committed aggravated sexual battery against the child and that the father likewise committed severe abuse by failing to protect the child from his mother's abuse. DCS obviously contends that the Circuit Court was correct in these findings; it, however, asserts that the Circuit Court erred by excluding the mother's admissions of sexual abuse to Ms. Plant and Detective Roach. Thus, DCS argues that the result should be affirmed but that this court should also find that the Circuit Court erred by excluding the mother's admission of sexual abuse.

We find the proof admitted into evidence in the Circuit Court clearly and convincingly established that the child was dependent and neglected. After reviewing the photographs and the testimony of those involved in this case, it would be difficult to find more compelling proof that the child was dependent and neglected. While the parents assert that this is simply a matter of them having a dirty home, or try to undermine certain conditions alleged to be hazardous, the pictures and the testimony when considered in totality present nothing short of a child surrounded by filth, squalor and moral depravity.

The Circuit Court then proceeded to determine if the child was a victim of severe child abuse, as is required by Tenn. Code Ann. § 37-1-129(a)(2). Severe child abuse is defined by Tenn. Code Ann. § 37-1-102 as:

(A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;
(B) Specific brutality, abuse or neglect towards a child which in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;
(C) The commission of any act towards the child prohibited by §§ 39-13-502-- 39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; or
(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17- 408(d)(2), is occurring.

While the order states that the child is a victim of severe child abuse and aggravated sexual battery, it does not identify which of the four statutory definitions support this finding. Review of the transcript indicates that the court found severe child abuse under (B) and (C).

Tenn. Code Ann. § 37-1-102(B), by definition, requires the opinion testimony of "qualified experts." *See In re R.C.P.*, No. M2003-01143-COA-R3-PT, 2004 WL 1567122 at *8 (FN 13) (June 11, 2004)[6]. There is no expert testimony in the record. Thus, despite the compelling testimony, exhibits and photographs, the record does not support a finding of severe child abuse under (B) because there is no expert testimony in the record. Tenn. Code Ann. § 37-1-102(C), however, does not require expert testimony. Our ruling concerning subsection (B) is solely based on the absence of expert testimony; however, the combined weight of the evidence, the testimony, exhibits and

_____

[6]Even in the face of "despicable" conduct, the opinion of a qualified expert is required. "The record does not contain the opinions of qualified experts that B.J.'s conduct, no matter how despicable, has or will produce severe psychosis, neurotic disorder, depression, developmental delay or retardation, or impairment of R.C.P's ability to function adequately in her environment." *In re R.C.P* at *8 (FN 13).

photographs, are more than sufficient to sustain a finding of severe child abuse under (C). *See In Re Valentine*, 79 S.W.3d at 548-49 (the court may consider the combined weight of the evidence).

The finding that the child was the victim of severe sexual abuse pursuant to Tenn. Code Ann. § 37-1-102(12)(C) is justified without considering the offered but excluded evidence of the mother's admissions of sexual abuse to Ms. Plant and Detective Roach. Nevertheless, we find that the exclusion of the mother's statements to Ms. Plant and Detective Roach, that she exposed the child to pornographic material, inappropriate sexual situations, and engaged the child in sexual activities between herself and the father, was error. Thus, the mother's statements should have been admitted under Tenn. R. Evid. 803(1.2)(A) as admissions by a party opponent, which only bolster the correctness of the judgment of the Circuit Court. A more thorough explanation of our reasoning for admitting the mother's admissions is set forth in detail in our discussion of the action to terminate both parties' parental rights.

Thus, we affirm the Circuit Court's finding that the child was dependent and neglected pursuant to Tenn. Code Ann. § 37-1-102(12)(B), (F) and (G), and in addition thereto a victim of severe child abuse pursuant to Tenn. Code Ann. § 37-1-102(C) because he was a victim of aggravated sexual battery, Tenn. Code Ann. §39-13-504(a)(4),[7] at the hands of his mother who actually engaged the child in sexual acts and the father participated in the sexual acts and failed to protect the child.

## Termination of Parental Rights Action

Termination of parental rights must be based upon a finding of clear and convincing evidence of at least one of the grounds in Tenn. Code. Ann. § 36-1-113(g) and that termination of the parents' rights are in the best interests of the child. The juvenile court terminated the parents parental rights after finding the grounds of abandonment, Tenn. Code Ann. § 36-1-113(g)(1); persistent conditions, Tenn. Code Ann. § 36-1-113(g)(3); and severe child abuse, Tenn. Code Ann. § 36-1-113(g)(4).

### Abandonment

Abandonment by the parent or guardian is found when one of five definitions of abandonment found in Tenn. Code Ann § 36-1-102 is satisfied. The Juvenile Court found that abandonment occurred pursuant to Tenn. Code Ann. §36-1-102(1)(A)(ii), which defines abandonment for purposes of terminating the parental rights of parents as follows:

> The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in

---

[7]Aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: (4) The victim is less than thirteen (13) years of age."

the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

The Juvenile Court found that during the four months following removal, DCS made reasonable efforts to assist the parents, prepared permanency plans, made appointments for both parents for psychosexual and psychological evaluations, notified the parents and their attorneys of the date, time and place of the evaluations and visited the home to monitor progress in cleaning up the home. The parents refused to enter into the permanency plans, refused to attend the psychosexual or psychological evaluations and failed to resolve the safety hazards regarding their home. Therefore, the court found that DCS made reasonable efforts to assist the parents to provide a suitable home, but the parents did not make any reasonable efforts themselves.

The child went into DCS custody on May 27, 2003, when the parents were arrested on charges unrelated to their care of the child, because the dual arrest created a situation where the child was temporarily without both parents. During the next five months, DCS made reasonable efforts to assist the parents so that they could provide a suitable home. To assist the parents, the case manager obtained funding for the psychological and psychosexual evaluations; however, both parents refused to attend the evaluations or counseling. On June 9, 2003, the case manager went to the home only to find that a "nominal effort" had been made. The case manager testified that the parents' extremely modest efforts did not "put a dent" in what needed to be done to make the home suitable.

Case manager Nickie Sprowl testified that on June 17, 2003 a "staffing" was held and a Permanency Plan prepared. She testified that she reviewed the plan with the parents and advised them of the criteria for termination of parental rights. Both parents attended the "staffing" but refused to sign the plan citing the advice of their counsel. However, regardless of whether the parents signed the plan, the case manager testified that the parents were told what they needed to do to remedy the conditions that made foster care necessary.[8] She went back to the home on August

---

[8]Though the parents refused to sign the proposed parenting plans, DCS workers advised the parents that they needed to either clean up the home or find another place to live so that the child would have a safe, suitable and sanitary place in which to live. They were also told that they, both parents, needed psychological and psychosexual evaluations; alcohol and drug assessments and that both parents would need to follow the recommendations provided. In addition, they were told not to allow persons in the home who would pose a threat to the child and have a legal means of income.

(continued...)

12, 2003 and was denied entry to the home. According to the case manager the parents' level of cooperation was "very minimal." The only conclusion to be drawn from the testimony was that the parents demonstrated such a lack of concern for the child that they would be unable to provide the child with a suitable home in the foreseeable future. Thus, we find that the record contains clear and convincing evidence of abandonment of the child by both parents.

## Persistent Conditions

The ground of persistent conditions is proven when the child has been removed from the home of the parent by order of a court for a period of six months and the conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parents, still persist; there is little likelihood that these conditions will be promptly remedied so that the child can soon be safely returned to the parents; and the continuation of the parent and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home. Tenn. Code Ann. § 36-1-113(g)(3). Here, the Juvenile Court held:

> The child was removed due to the extremely hazardous and filthy living conditions, lack of supervision of the child and neglect of the child. Following the removal, it was confirmed that the parents sexually abused the child by engaging the child in their sexual activity and by the mother committing sexual battery on the child while the father watched. In addition, the parents exposed the child to pornographic materials and sexual activity between adults. [Child] was used by the parents as a sex toy. Both parent refused to participate in psychosexual evaluations and psychological evaluations, which are the first step in treatment, therefore, have received no treatment. The hazardous and filthy living condition at the home still exists. The pictures speak for themselves. This is one of the worse [sic] homes the Court has ever seen. There is little likelihood that these conditions will be remedied at an early date so that the child could be safely returned to his parents in the near future. Both parents have had their parental rights to older children terminated in the State of Ohio. The appellate decisions from these previous termination of parental rights proceedings show that the parents failed to cooperate with services and failed to rectify the problems with the condition of their home during proceedings and give a good indication of what would happen in this case. Given their lack of efforts in Ohio and their lack of efforts since the removal of [Child], it seems unlikely [Mother] or [Father] will remedy those conditions in the near future. The continuation of the parent/child relationship greatly diminishes the child's chances of an early integration into a safe, stable, and permanent home.

---

[8](...continued)
Both parents failed to abide by any of these instructions.

The child had been in DCS custody for more than six months. The hazardous, filthy and unsuitable conditions were never corrected. The case manager testified that she did a "drive-by" inspection of the home on April 6, 2004, and June 21, 2004, and that the exterior of the home was still in a deplorable condition and possibly even worse than when the child went into DCS custody. These conditions are extremely well documented by the photographs of the home and these pictures, more powerfully than any words we could choose, describe the horrifically filthy living conditions to which this child has been subjected. What clearly emerges from the pictures and the testimony is that there was simply no safe place for this child at the home, whether to be protected from the filthy conditions or the illicit acts of his parents.

The second requirement was clearly established by the parents' failure to comply with any of the proposed Permanency Plan requirements or recommendations of the case manager with the possible exception that a legal means of income is provided via Social Security disability benefits being paid to one or both parents. Furthermore, review of the termination cases from Ohio showed that in both cases the mother and father failed miserably in remedying the conditions that brought those children into the custody of Ohio's Department of Human Services despite the extraordinary efforts of the caseworkers in those cases.

As for the third requirement, the case manager testified that she obtained appropriate counseling for the child, given his age, in an attempt to resolve his abuse-related problems. The case worker opined that the continuation of the parent-child relationship would set the child back in terms of the progress he had made. We also note the testimony of the foster mother as to the child's inappropriate sexual behavior and the efforts she had made to have the issues resulting from the parents' abuse resolved. For obvious reasons, continuing the parent-child relationship which appears to be the source of this behavior would severely undermine this child's chances of integration into a "safe, stable, and permanent home."

Accordingly, we find that the record contains clear and convincing evidence of persistently deplorable conditions which prevent the child from being safely returned to the parents and that the continuation of the parents' relationship with the child greatly diminishes the child's chances of an early integration into a safe, stable, and permanent home.

Severe Child Abuse

The juvenile court found that the parents had subjected the child to severe child abuse. It found that severe abuse under Tenn. Code Ann. § 37-1-102 (21)(A) and (C) occurred because of the "conditions of the home, the safety hazards in the home, the lack of supervision of the child and the neglect of the child where [sic] of such magnitude, especially when they are viewed together, that they placed the child at great risk of great bodily harm or death. The sexual abuse of the child also constitutes severe child abuse." Subsection (A) of Tenn. Code Ann. § 37-1-102 (21) defines severe child abuse as:

The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death; . . .

Subsection (C) of Tenn. Code Ann. § 37-1-102 (21) defines severe child abuse as:

The commission of any act towards the child prohibited by §§ 39-13-502-- 39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; . . .

The statutes enumerated in subsection (C) pertain to criminal offenses of sexual abuse of a child less than thirteen years of age.

The record before us, including photographs and testimony, clearly and convincingly support a finding of severe child abuse. Numerous witnesses testified of hazards the child was exposed to when they first arrived at the family residence, such as knives, drug paraphernalia, and exposed electrical wiring within the child's reach. Testimony of the first deputy to arrive indicated that the child was playing outside barefooted and unsupervised, drinking spoiled milk at the insistence of his mother. The premises where the child lived, inside and outside of the house, can only be described as something between a garbage dump and a junkyard. The environmental hazards the child was exposed to at the premises were serious and plentiful. There is also substantial evidence of severe sexual abuse, some direct, some circumstantial. There is the testimony of Deputy Mike Hoover who heard the child exclaim, "Daddy, jack me off" when the child saw a pornographic videotape cover in the home.[9] There are the mother's admissions to the DCS investigator and to Detective Roach, both of which clearly establish that the mother sexually abused the child in an active manner and that the father, at the very least, engaged in passive sexual abuse of the child.[10] We also have the testimony of the foster mother. She testified that the child has acted out in a sexually inappropriate way on numerous occasions such as attempting to follow her into the bathroom, tried to watch her take a shower, had attempted to touch both her and her husband in inappropriate areas such as the breast and crotch, and that the child's attempts had been persistent. On one such occasion the foster mother testified that she had to remove the child from church because the child kept trying to touch her breast.

Much, but not all, of the evidence of severe sexual abuse of the child by the parents came into evidence by way of the mother's admissions through the testimony and records of Ms. Plant and Detective Roach. The parents claim that this evidence was obtained by Ms. Plant and Detective

---

[9] Although he testified in the dependency and neglect proceeding, but not the termination proceeding, Sergeant Brian Whitefield corroborated the testimony of Deputy Hoover with respect to the child's explicit remark.

[10] Mother admitted that she had the child touch her vaginal area with his hands and her breasts with his hands and his mouth, while Father watched and masturbated.

-13-

Roach in violation of the Fourteenth Amendment.[11]   In a June 3, 2003 interview by Ms. Plant, the mother stated that both she and the father engaged in sexual acts with the child.  Three days later, on June 6, 2003, the mother gave Detective Roach a signed statement making similar admissions. The interviews occurred after the parents were appointed counsel at a hearing on May 29, 2003.[12] Both parents argue that the mother's statements were improperly admitted into evidence and should have been excluded.

DCS contends the evidence obtained by Ms. Plant was admissible for several reasons.  One, DCS is not a prosecutorial agency and its actions should not be judged by that standard because its mission is to provide services as required by law to children committed to its custody, citing Tenn. Code Ann. § 37-5-106(2).  Two, when faced with a conflict between the rights of the parents and the rights of the child, DCS and the courts must resolve the conflict in favor of the child's best interests. Three, DCS further asserts that preventing DCS from working directly with parents who are represented by counsel would impair it in the performance of one of its primary responsibilities, determining which services are needed to keep the family together.  Without direct contact with the parents, DCS would be forced to perform its duties "in the dark" because it would be deprived of a full understanding of the child's and the family's needs.  Without such information, DCS contends it could not perform its duty to ascertain the needs of the family or, thereafter, establish and administer permanency plans.  DCS also argues, when allegations of child sex abuse are made, it is required to investigate and determine the kind of abuse that has occurred so that appropriate treatment for the child can be provided.  And finally, it contends the right against self-incrimination is not self-executing.  The mother could have asserted her right against self-incrimination in the interview just as she chose to do in later proceedings.  As for the evidence obtained by Detective Roach, who did not work for or on behalf of DCS, DCS contends that he advised the mother of her Miranda rights, that she waived her rights, and thus her statements to Detective Roach are admissible.

Rule 39(f)(2) of the Tennessee Rules of Juvenile Procedure requires the courts in a termination case to inform an unrepresented party of their right to counsel and if the party is indigent, the court is required to consider the "facts and circumstances alleged and make a determination as to whether an attorney should be appointed."  These procedures are mandatory. *In Re Valle*, 31 S.W. 3d 566, 572 (Tenn. Ct. App. 2000)(citing *State, Dept. of Human Services v. Taylor*, No. 03A01-9609-JV-00286, 1997 WL 12242 at *2 (Tenn. Ct. App. March 19, 1997)).  In this case, the court promptly met this requirement by appointing counsel for both parents at the initial proceeding in the Juvenile Court.  Moreover, the appointment of counsel occurred prior to the mother making any of the admissions at issue.

---

[11]The disputed evidence was only admitted in the termination action; it was excluded in the dependent and neglect action.  Thus, the admissibility of this evidence is only discussed in the termination action.

[12] Though the father was interviewed, his statements to the DCS worker are not at issue.

A party to a civil action may claim the benefit of the privilege against self-incrimination. *Arndstein v. McCarthy*, 254 U.S. 71,73 (1920). As a general rule, the privilege against self-incrimination is an affirmative right that is deemed waived unless it is effectively invoked. *Rogers v. United States*, 340 U.S. 367, 371 (1951). However, an individual is not required to invoke the right to avoid self-incrimination during a custodial interview by a government agent or if the government has threatened a penalty if the privilege is asserted. *State v. Smith*, 933 S. W. 2d 450, 453 (Tenn. 1996). Normally, the privilege against self-incrimination is not self-executing. *U.S. v. Myers*, 123 F. 3d 350, 359 (6ᵗʰ Cir. 1997). A witness who fails to invoke the Fifth Amendment against questions to which they could have claimed it, is deemed to have waived the privilege respecting all questions on the same subject matter. *United States v. O'Henry's Film Works, Inc.*, 598 F. 2d 313, 317 (2d Cir. 1979).

"It is clear that the privilege does protect against the risk of conviction for what are technically criminal offenses and equally clear that it does not protect against the imposition of liability for damages on the basis of traditionally civil causes of action. Whether it protects against types of liability that are between these two poles is less clear." John W. Strong, *McCormick on Evidence*, Vol. 1, § 121, (5ᵗʰ ed. 1999). Courts from other states dealing with this issue have reached differing results. In an Oklahoma termination proceeding a stepfather made an oral motion in limine to prevent the State from calling him to the stand. The stepfather asserted that if called he would assert his Fifth Amendment privilege against self-incrimination and that invocation of such a right in front of the jury would be prejudicial. The court overruled the motion and the stepfather was called to the stand where he invoked the Fifth Amendment. The appellate court affirmed, basing its ruling on the distinction between civil and criminal proceedings.

> In Oklahoma, in earlier rulings, juvenile proceedings were considered to be neither civil nor criminal in nature, but special proceedings, "partaking of the elements of civil and criminal procedures." *Stratton v. Steele*, 519 P.2d 468, 471 (Okla.1974). More recent law clearly draws a distinction between deprived/parental termination cases and criminal cases as shown by *In re S.T.G.*, 806 P.2d 636, 638-9 (Okla.1991) (citation omitted), where the [Oklahoma] supreme court stated:
>
>> We agree that the relationship of parents to their children is a fundamental right with constitutional protection, and there are similarities between criminal cases and parental termination cases ... Nevertheless, parental termination cases and criminal cases are not the same.
>
> It is therefore clear, since this is not a criminal proceeding, that the summoning of Rick to the stand to invoke his privilege against self-incrimination did not violate his constitutional rights.

*Matter of C.C.* 907 P.2d 241, 244 (Okl.App.,1995).

In an Oregon termination proceeding the mother argued that the court erred in requiring her to testify in the state's case-in-chief:

> She contends that the Fifth Amendment to the United States Constitution protects a parent from testifying against herself in a termination case, because termination involves a parent's liberty interests and the severity of the findings resulting in termination are "akin to guilt." She asks that we overrule an earlier holding that, in termination proceedings, the Fifth Amendment right against self-incrimination does not extend to all testimony by a parent but is limited to statements that tend to expose the parent to criminal liability. (citations omitted)
>
> In *Wade*, we said:
>
>> "Because the termination of parental rights is an action ostensibly designed to promote the best interests of children rather than to penalize parents, we are unwilling to equate such an act with the deprivation of personal liberty which results from a criminal conviction." 19 Or.App. at 327, 527 P.2d 753.
>
> Although cases since *Wade* have recognized the liberty interests of parents in a termination case and the severity of the possible outcome, (footnote omitted) termination proceedings have not been placed on the same footing with criminal proceedings. *See State ex rel. Juv. Dept. v. Geist*, supra. (footnote omitted) We decline to do so by extending Fifth Amendment protection in a termination proceeding.

*State ex rel. Juvenile Dept. of Multnomah County v. Charles,* 859 P.2d 1162,1165 - 1166 (Or. App. 1993).

In a Nebraska termination proceeding, the court found that forcing a parent in essence to choose between asserting their right against self-incrimination and their children violated the Nebraska and United States Constitution. *In re Interest of Clifford M. v. Suzette M*., 577 N.W. 2d 547, 557 (Neb. Ct. App. 1998). In that case, the mother was required to participate in a therapy program. The court ordered program required that she admit she was a sex abuse offender to participate in therapy. *Id.* at 550. The mother refused to admit that she was an offender. Thereafter, her parental rights were terminated in part because she refused to participate in the therapy program. *Id.* at 557.

The parents object to the admission of testimony by Detective Roach with the Putnam County Sheriff's Department and a written statement the mother provided to Detective Roach. He interviewed the mother on June 6, 2003 at the offices of Child Protective Services. The mother was not in custody at the time of the interview by Detective Roach. Thus, the requirements of a custodial

interrogation need not be met.[13] Nevertheless, Detective Roach gave the mother Miranda warnings before she made her "statement." The second page of the statement contains an "Admonition and Waiver" which sets forth Miranda Rights and below those rights is a "Waiver of Rights" which states:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coersion [sic] of any kind has been used against me.

Detective Roach testified that he read the statement he transcribed for the mother to make sure that it was accurate, that he went over the waivers with her, asked if she understood the waivers, she told him she did, and then she signed the "Statement" and "Waiver of Rights." Detective Roach witnessed her signing both documents.

The record clearly establishes that Detective Roach did not conduct a custodial interrogation of the mother. Moreover, it establishes that the mother was informed of her Miranda rights, she waived those rights, and voluntarily made the statements at issue. Therefore, we find no error with the Juvenile Court admitting into evidence the mother's "statement" and other admissions to Detective Roach.

The parents also object to the admission of statements made by the mother to Ms. Plant, the DCS investigator. The mother was appointed counsel on May 29, 2003 at the initial dependent and neglect hearing. The next day, while the mother was in custody for assisting the father to evade the arresting officers, she was interviewed by Ms. Plant,[14] who testified that the reason for interviewing the mother was to determine if the child had been subjected to sex abuse so that the child could receive proper treatment. Ms. Plant testified that the timing of the interview was a routine and important practice because the child had just come into the custody of DCS and DCS needed to promptly provide appropriate services for the benefit of the child. Moreover, Ms. Plant had reason to ask the questions at issue because she suspected such abuse for two reasons. One was based on the child's sexually explicit comment in the presence of the deputies, "Daddy, jack me off." The other was due to the termination of the parents' rights to five other children in Ohio.[15] Ms. Plant

---

[13]Custodial interrogation is questioning that is initiated by a law enforcement officer after a person has been taken into custody or otherwise deprived of his freedom in any significant way. *United States v. Harris*, 611 F. 2d 170, 172 (6th Cir. 1979). For custodial interrogation to be established three factors must be present: 1) the subject must be in custody, 2) there must be an interrogation, and 3) the interrogation must be conducted by a state agent. *State v. Smith*, 933 S.W. 2d 450, 453 (Tenn. 1996). Fifth and Sixth Amendments rights, established by *Escobedo* and *Miranda,* are limited substantially to in-custody interrogation. *Stern v. Robinson*, 262 F. Supp. 13, 15 (W.D. Tenn. 1966).

[14]There were a total of three interviews of the parents, on May 30, June 3 and June 6, 2003.

[15]See *In the matter of Listi Anne Ranker*, No. 99-P-0072, 2000 WL 1488060, 2000 Ohio App. LEXIS 4662 (Court of Appeals of Ohio, Eleventh District, Portage County October 6, 2000) and *In the Matter of: Samuel Ranker,* (continued...)

testified that she was not requested or encouraged by attorneys for DCS or by law enforcement officials to obtain information in the interviews. Ms. Plant further testified that she did not force or coerce the mother into making any statements. She explained:

> June 3rd, 2003 I interviewed her again. And I was just really blunt with her. I said, "I think there is more to this story. Is there more to this story?" And she shook her head "yes" and put her head down toward her chest, and said it was hard to talk about it because it hurt her heart. I explained to her that my concern was that [the child] needed a chance in life to be a normal kid, and that whatever we did at this point was important, and that we couldn't get past where we were unless she was honest with me. That's when she made further statements about the sex abuse.

Ms. Plant testified that her questioning regarding sexual abuse was driven by her objective to provide proper treatment for the child. Thus, the purpose of Detective Roach's investigation was for an entirely different purpose than that of Ms. Plant. Moreover, there is no evidence to suggest that she discussed or received any advice from DCS attorneys or law enforcement as to how to proceed with her investigation. The record establishes that her interviews were not motivated by a desire to obtain information for criminal prosecution; to the contrary, she was attempting to ascertain which services or therapies were needed so that DCS could properly care for the child who had just come into DCS custody.

The Tennessee General Assembly has addressed whose rights take priority in conflicts between the best interests of the child and the best interests of its parents.

> In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed.

Tenn. Code Ann. § 36-1-101(d). Moreover, "the legislature has determined that society's interest in exposing the sexual abuse of children transcends an accused's interest in the confidentiality of his or her communications regarding such abuse." *State v. Smith*, 933 S. W. 2d 450, 457 (Tenn. 1996). This determination is evident in the legislature's enactment of Tenn. Code Ann.§ 37-1-614 which

---

[15](...continued)
*Adam Ranker, Joshua Ranker, and Timothy Ranker, Jr.,* Nos. 95-P-0093, 95-P-0094, 95-P-0095, 95-P-0096, 1996 WL 761159, 1996 Ohio App. LEXIS 5516 (Court of Appeals of Ohio, Eleventh District, Portage County December 6, 1996).

expressly states that the only evidentiary privileges recognized in a situation involving child sex abuse are between attorney and client.[16]

When the interviews occurred, the mother had already been appointed counsel. She did not ask that her counsel participate in the interviews. Moreover, she did not make any assertion of her privilege against self-incrimination under the Fifth Amendment in the interviews. Considering the duties of DCS to care for the child, who had just come into its care and custody, that DCS had an affirmative duty to make reasonable efforts to provide appropriate services for the benefit of the child and the family unit, that the mother had been appointed counsel and that the mother voluntarily agreed to be interviewed, we find that the interviews of the mother by Ms. Plant did not violate the mother's rights. Thus, the mother's admissions were properly admitted into evidence.[17]

Accordingly, we affirm the court's findings of severe child abuse under Tenn. Code Ann. § 37-1-102 (21)(A) and (C).

### Best Interests of Child

In addition to finding that one of the statutory grounds exists for terminating parental rights, the court must also find that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(i) provides nine nonexclusive factors for a court to consider in determining whether termination is in the child's best interests. In this case the court found that termination was in the child's best interests based on factors 1, 2, 4, 5, 6, 7 and 8. An examination of each follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian?

Case manager Sprowl testified that the parents did not make an adjustment or change in conditions or circumstances so as to make it safe and in the best interest of the child to be in the home. The record in this case is replete with proof of this factor. Perhaps the most obvious example of this failure is the case manager's testimony that she drove by the home on April 6, 2004, and June 21, 2004, and that the outside of the home was still in deplorable condition and was possibly in worse condition than when the child went into DCS custody.

---

[16]"The privileged quality of communication between husband and wife and between any professional person and the professional person's patient or client, and any other privileged communication except that between attorney and client, as such communication relates both to the competency of the witness and to the exclusion of confidential communications, shall not apply to any situation involving known or suspected child sexual abuse and shall not constitute grounds for failure to report as required by this part, failure to cooperate with the department in its activities pursuant to this part, or failure to give evidence in any judicial proceeding relating to child sexual abuse." Tenn. Code. Ann. § 37-1-614.

[17]Had we excluded the testimony of Ms. Plant and Detective Roach, there would still be more than sufficient evidence to sustain the finding of severe child abuse because, considering the evidence in its totality, the evidence of severe child abuse is compelling.

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible?

Case manager Sprowl testified that the parents had failed to make a lasting adjustment after reasonable efforts. Review of the testimony in this case shows that DCS made reasonable efforts to assist the parents until this obligation was properly relieved by the court. From the outset the parents refused to cooperate. Our focus here is not that the parents refused to sign the Permanency Plan or that the parents refused to attend the evaluations, although understandably important. The focus is that nothing prevented the parents from making meaningful efforts to do something to indicate a spirit of cooperation – simplest of all and one of the most important – cleaning up the home.

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child?

Case Manager Sprowl testified that she saw nothing to evidence the establishment of a meaningful relationship. Because of the proof in this record of abuse, it is impossible to find the existence of any meaningful relationship with the mother or father.

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition.

The foster mother testified at length about the child's problems, efforts to resolve the problems and how much the child has improved. Case manager Sprowl testified that any contact with the parents would be a setback for the child. The child's sexually inappropriate actions and his persistence in these actions show how much help the child needs so that he can lead a healthy and normal life and how much damage would be done, (1) if the child's issues resulting from the abuse are not properly addressed, and (2) if he were returned to his parents' care.

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household?

The proof is overwhelming. Here, the mother admitted sexually abusing the child. Such admissions were made to Ms. Plant and Detective Roach on two separate occasions. Further, the mother acknowledged the father's awareness and participation in these acts. In addition, both deputies at the scene testified as to the child's inappropriate comments, and the foster mother testified extensively about the child's inappropriate sexual behavior and the persistence of the behavior. All of these incidents corroborate the mother's own admissions.

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled

substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner?

The case manager testified that the home was unhealthy. On her first visit to the home she noticed a "nominal" but insufficient effort to clean up the home. She was refused entry on another occasion, and approximately one year after the child was placed in DCS custody the home, at least on the outside, remained in a deplorable condition. The record shows that drug paraphernalia was found in the home and on the day of her arrest the mother indicated that she would test positive for marijuana and hydrocodone. The proposed Permanency Plans contained a requirement that the parents would submit to an alcohol and drug evaluation and drug screens. Not only did the parents refuse to sign the Plans, they also refused to be evaluated or treated for drug abuse.

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child?

The case manager testified that the parents' emotional status would be detrimental to the child. The record clearly establishes that the child would be further damaged by the parents' mental and/or emotional status. The parents' refused the psychological and psychosexual evaluations despite DCS obtaining funding for the evaluations.

Accordingly we find the record clearly and convincingly supports the Juvenile Court's findings that termination of the parents' parental rights are in the child's best interests.

**In Conclusion**

We affirm the judgment of the Circuit Court and the judgment of the Juvenile Court. The matters are remanded to the respective courts with costs of appeal being assessed against the parents.

_____
FRANK G. CLEMENT, JR., JUDGE