IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 3, 2011 Session

## STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES v. EDDIE DAVIS

Appeal from the Chancery Court for Hamblen County
No. 2009-463      Jon Kerry Blackwood, Senior Judge

No. E2010-02016-COA-R3-CV-FILED-JULY 28, 2011

A nine-year-old child, whose initials are C.M. ("the Child"), told her mother, whose initials are also C.M. ("Mother"), that Eddie Davis had touched her inappropriately. The disclosure was made shortly after the Child had reviewed a comic book that is designed to help children recognize and disclose child sexual abuse. Davis is the executive director of the Youth Emergency Shelter ("Y.E.S.") in Hamblen County. The Department of Children's Services ("DCS"), a state agency, initiated an investigation and "indicated"[1] Davis as a perpetrator of child sexual abuse.  Davis requested an administrative hearing. The administrative law judge ("the ALJ") found that the Child's statements to Mother and later to a forensic interviewer were credible because they were "consistent" in that she told both a story of Davis putting his hand on her buttocks inside her panties. Davis appealed the ALJ's finding to the trial court. The trial court sustained the findings of the ALJ. Davis appealed to this Court. Because there is no substantial and material evidence to support the findings of the ALJ, we reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Wayne R. Stambaugh, Morristown, Tennessee, for the appellant, Eddie Davis.

---

[1] To be "indicated" means that the report of abuse has been "validated" by DCS after some sort of investigation. Upon being "indicated," DCS notifies the person and/or any employer that he or she is not allowed to work around children. Thus, a person can be branded a pedophile for life based simply on a DCS investigation. *See Brown v. State*, No. E2004-01272-COA-R3-CV, 2004 WL 2715283 at *6-7 (Tenn. Ct. App. E.S., filed Nov. 30, 2004).

Robert E. Cooper, Jr., Attorney General and Reporter; Joe Whalen, Associate Solicitor General; and Douglas Earl Dimond, Senior Counsel, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.

Y.E.S. provides a temporary home for children in crisis. It is located in Morristown. Davis has been employed there since 1978. He has an impeccable reputation. Until the accusation at issue in this appeal, he had never been accused or implicated in any way in the abuse of a child.

Mother was a long-time employee of the youth shelter; she had worked there since 1992. She and the Child were close to Davis and his wife. It is undisputed that both families considered the other like family. Mother adopted the Child when she was seven months old. Davis and his wife allowed the Child to accompany Mother to work, where the Child played at the shelter and often visited Davis in his office. Mother worked at the shelter approximately an hour a day, five days a week.

Part of Mother's job required her to have the children at the shelter read a comic book that instructs them on how to recognize and report sexual abuse. One day in October 2007, the Child read the comic book and then reported to Mother that Davis had touched her inappropriately on several occasions in his office. Mother initially did not believe the Child and tried to talk her out of her story. The Child stated that Davis touched her in her panties in the back at least five times and that he touched her once in the front, outside her panties. According to Mother, the Child described that Davis touched her in a groping motion on her bottom.

On November 1, 2007, Wayne Tasker, a professional counselor, talked to the Child as a favor to Mother. He told Mother that he believed the Child to be lying.

Almost a year passed before Mother reported the Child's disclosure. Mother's explanation of the delay was that she did not initially want to pursue the allegation but decided to report Davis after she learned that he was going to be a "house parent" at Y.E.S., where he would be in a more hands-on environment with children. She also feared that she might lose her adopted daughter if she did not pursue the allegation and expressed concern that she might lose her job as a guidance counselor if she did not report the alleged abuse. During that year, Mother did not have the Child medically examined nor did the Child receive any counseling.

Mother initially brought the allegation to the district attorney's office. No criminal charges were ever brought against Davis.

On September 1, 2008, DCS received a referral which alleged that Davis had committed acts of sexual abuse against the Child while acting as director of Y.E.S. DCS began an investigation led by Terry Ryan of its special investigations unit. On September 9, 2008, the Child underwent a "forensic" interview by Daniel Velez. Velez's report stated "[the Child] reported that [Davis] touched her on her thighs while she sat on his lap." The Child stated that she had "known [Davis] for some time and would stay with him in his office while [Mother] went to work. [The Child] reported that she would sit on his lap, on his desk chair, while [Davis] did some work . . . [The Child] denied that [Davis] did anything else to her. She denied [Davis] telling her anything after she would leave his office." She stated that Davis only touched her outer thigh; "[the Child] denied [Davis] did anything other than touch her on her thigh." Velez made no comments, either in his report or in his later testimony, on the emotional state of the Child nor did he express a professional opinion on the matter. His role was only to take the Child's statement.

In order to classify an allegation as "indicated," at least one "Validation Factor" must be met per Policy No. 14.7 of DCS's Administrative Policies and Procedures. Investigator Ryan used the validation factor of "consistency"[2] of the Child's statements to "indicate" Davis. Ryan found the two disclosures by the Child to be consistent, although the Child told Mother she was touched on her buttocks and told Velez that she was touched on her outer thigh.

Ryan's classification of the referral was upheld by the Commissioner's case file review process. Davis was notified on October 15, 2008, that he had been "indicated," and he exercised his right to an administrative "fair hearing." Y.E.S. was immediately informed of Davis's alleged status as "indicated," the effect of which was to prevent Davis from working with children.

Before the administrative hearing could be held, DCS filed suit against Davis in juvenile court. DCS sought (1) a declaration that the Child was dependent and neglected, (2)

---

[2] Policy 14.7 states:

> Consistency. If the child is interviewed more than once, the responses and statements are generally consistent from one interview to the next. Parts of the story are corroborated by other circumstances and/or witnesses.

an order preventing Davis from working at Y.E.S., and (3) an order preventing contact between Davis and the Child. The juvenile court held a hearing and entered its Final Order on December 15, 2008. The court found that the Child was not dependent and neglected, dismissed the ex parte restraining order it had earlier entered, and upheld the no contact with the Child based on Davis's stipulation that he would not have contact with the Child. The court held "the ... allegations against [Davis] do not qualify as abuse under T.C.A. § 37-1-152(1) since [Davis] is not a parent, guardian, or caretaker of the minor child." In addition, the court found that DCS "had alleged no statute or allegations that would provide for a restraining order against [Davis] with regards to the Youth Emergency Shelter, its residents, or any other individual." The decision in juvenile court was not appealed.

The administrative hearing was held on July 10, 2009. Davis testified on his behalf and denied ever touching the Child inappropriately. The only explanation that Davis could think of regarding the allegation was that there were times when the Child sat directly on top of his keys and he had to pick her up and place her on his other leg. There were multiple character witnesses that testified on Davis's behalf to the effect that thousands of children had passed through the shelter and yet there had never been any complaint lodged against Davis in over thirty years of service at Y.E.S. Further, it is undisputed that at no time while the Child was in Davis's office was the door ever closed or locked. Thus, at all times when Davis was allegedly touching the Child inappropriately, an employee or resident of Y.E.S. could have freely walked in and seen what was happening. There were no witnesses to the alleged abuse other than the Child.

The Child did not testify. Her statements to Velez and to Mother were admitted into evidence as hearsay exceptions pursuant to Tenn. R. Evid. 803(25).[3] Wayne Tasker submitted an affidavit with respect to what the Child told him. The ALJ found that the affidavit of Tasker did not carry weight in assessing the consistency of disclosures made by the Child because Tasker interviewed the Child in 2007, without taking any notes or making any record. Tasker did not prepare his affidavit until 2009.

Interestingly, witness Velez also did not make any notes other than his short report, but his testimony was given considerable weight by the ALJ. We will provide a lengthy excerpt of that testimony:

> Q:    Did [the Child] ever disclose any occasions in which
>       [Davis] touched any other body parts on her?

---

[3] Hearsay is generally not admissible evidence. Tenn. R. Evid. 803(25). The list of exceptions that "are not excluded" includes "statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect." Tenn. R. Evid. 803(25).

A:    No. She did not.

Q:    Is that all accurate? Is that all as reflected in your report here?

A:    That's correct.

Q:    Okay, How did she come – how did she come to be in a position where he would put his hand down her pants?

A:    How she described it was that she sat in his lap and he put his hand behind, behind like this; and then he laid his hand right there under her underclothes.

Q:    Okay.

    The Court: When you say, "right there," where is your hand indicating today?

    The Witness: Right here in this area.

    Mr. Stambaugh: You need to – can you name the body part for us because there's no video here. We need to have it –

    The Witness: That's her thigh.

    Mr. Stambaugh: And well, what part –

    The Court: Upper thigh, below what would be traditionally a panty line on a girl. Is that right?

    The Witness: She went like this. This is how she described it.

    The Court: Well, did she use her – I'm sorry. Did she use her hand to show?

    The Witness: Yes, she did. Yes.

-5-

The Court: And I'm going to describe it for my own benefit because I'm recording this.

Mr. Stambaugh: If I can stand up and just see where his hand is placed.

*The Court: It appears – to me anyway – that you have demonstrated that the [C]hild showed the alleged perpetrator's hand going down through the top of a panty, through the leg portion of a panty, to the outside top of the thigh.*
*In fact, the very top of the thigh just under the bottom part of a girl's panty leg opening. Is that a sufficient description?*

(No response.)

The Court: Does anyone disagree with that?

Mr. Smithwick: No.  I don't disagree.

The Court: Mr. Stambaugh?

Mr. Stambaugh: I can because we're talking the difference in the size of a man versus a small girl.
But he is down – and I would say a little bit upper – not mid thigh, but a little bit higher than mid thigh.

The Court: All right.

*Mr. Stambaugh: But definitely not the side of the waist and not the side of the hip.*

*The Court: That's fine. All right.*

\* \* \*

Q:      . . . [T]here is no doubt that in your report there is no information containing the fact that [the Child] was ever touched on her breasts, correct?

-6-

A:     That's correct.

Q:     Or her genital area?

A:     That's correct.

Q:     Or her groin?

A:     That's correct.

Q:     Or her inner thigh?

A:     That's correct.

Q:     Or her buttocks?

A:     That's correct.

Q:     *So, you're saying that the only place [Davis] is alleged to have touched [the Child] is on her outer thigh?*

A:     *That's correct.*

\*   \*   \*

Q:     [The Child] couldn't even tell you what kind of clothing she wore on any of these occasions?

A:     That's correct.

Q:     So, how do you know that he reached down, even through what is alleged to be her panties, to touch her outer thigh if you did not know what she was wearing?

A:     My job is basically to report what the child says. I do not state an opinion about whether she's telling the truth or not.

\*   \*   \*

Q:    And I want you to think about the statement that [the Child]...gave to you, and you state to me where it is in your statement anywhere in here that she was touched in a private area.

A:    She did not ever say that she was touched in a private area.

(Emphasis added.)

After reviewing the disclosures the Child made to Mother and to the forensic interviewer, the ALJ found Davis's touching of the Child's outer thigh, alone, did not fall within the definition of Tenn. Code Ann. § 37-1-602 (2010)[4]. Also, the ALJ treated the alleged touching disclosed to Mother on the outside of the child's clothing in the front part or the vaginal area as not substantiated.

Despite the ALJ's finding that the touching of the Child's outer thigh did not fall within the definition of child sexual abuse, she did conclude that to touch the Child on her outer thigh, Davis would have also had to touch her in other private places:

> The question is whether the area covered by the child's panties qualifies as being an area included in the definition of child sexual abuse....[T]he testimony given eliminated several areas of the body as those that were touched....A practical view of the descriptions of the touching does show that [Davis's] hand would have had to enter around a waistband area and descend into the *buttocks* area. The statute lists "buttocks" as an area included in the definition of child sex abuse.

(Emphasis added.)

The ALJ found that this was likely the circumstance because the Child's disclosures to Mother and Velez, in the judgment of the ALJ, were consistent. She concluded that the Child's testimony was made consistent by the following factors: setting, identification of Davis, description of Davis putting his hand inside the Child's panties, and the alleged position where the hand was placed. Because Tenn. Code Ann. § 37-1-602 lists "buttocks"

---

[4] The statute defines child sexual abuse as "the intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them."

as an area included in the definition of child sexual abuse, the ALJ therefore concluded that "Validation Factor (d)" of DCS's Administrative Policy 14.7 was met and held that Davis's actions fell within the definition of sexual abuse.

By its initial order on September 15, 2009, the ALJ found, ostensibly by a preponderance of the evidence, that "[Davis] committed child sexual abuse involving [the Child]," and upheld DCS's classification of Davis as "the indicated perpetrator in a validated case of child sexual abuse involving [the Child]." The initial order was adopted by the Commissioner of DCS.

Davis timely appealed to the trial court. The trial court affirmed the decision of the ALJ. The court stated that

> [t]he Administrative Judge was able to observe the testimony, assess the consistency of the [C]hild's statements to the witnesses, as well as observe the descriptions of [the Child's] demonstration of the hand movement while she was in [Davis's] lap. This Court did not have that opportunity. Certainly this Court cannot conclude that the Administrative Judge's decision lacked a rational basis for its conclusion.

The court also found that res judicata did not apply as between the dependency and neglect case in juvenile court and the administrative agency proceeding.

II.

Davis filed a timely notice of appeal to this Court. He raises two issues, which we have restated:

> Whether the juvenile court's refusal to enjoin Davis from performing his job at Y.E.S. is res judicata to the DCS determination that effectively prevents him from working around children at Y.E.S. because he has been indicated in the sexual abuse of a child.

> Whether there is substantial and material evidence to support the determination that Davis touched the Child inappropriately.

III.

The issue of whether one action is barred by the res judicata effect of a previous action is a question of law. *In re Estate of Boote*, 198 S.W.3d 699, 719 (Tenn. Ct. App. 2005). A trial court's determination regarding res judicata is reviewed *de novo* with no presumption of correctness. *Id*.

When a challenge is made to the sufficiency of the evidence to support an administrative agency decision made by an administrative law judge, we review the entire record to determine whether the decision is supported by "evidence which is both substantial and material." Tenn. Code Ann § 4-5-322(h)(5)(2005); *Papachristou v. University of Tennessee*, 29 S.W.3d 487, 490 (Tenn. Ct. App. 2000). Substantial and material evidence is "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for" the decision being reviewed. *Papachristou*, 29 S.W.3d at 490 (*quoting Clay County Manor v. State of Tennessee*, 849 S.W.2d 755, 759 (Tenn. 1993)). Our review of the trial court's decision is essentially a determination of whether or not the trial court properly applied the "substantial and material evidence" standard of review. *Id*. We do not substitute our judgment for the administrative fact-finder, but we do consider evidence in the record that detracts from the weight of evidence that the ALJ found persuasive. *See Jones v. Bureau of TennCare*, 94 S.W.3d 495, 501 (Tenn. Ct. App. 2002).

IV.

A.

Davis argues that the judgment of the juvenile court bars the DCS determination that he is "indicated" as a perpetrator of child sexual abuse because the practical effect of the DCS determination is to prevent him from working around children whereas the juvenile court refused to grant an injunction preventing him from working around children. We disagree with Davis's position. Generally, a valid judgment bars a subsequent action concerning all issues litigated as well as those that could have been litigated. *See Lien v. Couch*, 993 S.W.2d 53, 56 (Tenn. Ct. App. 1998). However, a favorable judgment does not bar a later action unless the person asserting res judicata as a defense proves numerous elements including that "both proceedings involved the same cause of action." *Id*. The action in juvenile court in the instant case was a proceeding seeking to declare that the Child was dependent and neglected. The burden of proof applicable to such a proceeding is clear and convincing evidence. *State Dept. of Children's Services v. M.P.*, 173 S.W.3d 794, 801 (Tenn. Ct. App. 2005)("A finding of dependency and neglect must be based on clear and convincing evidence. Tenn.Code Ann. § 37–1–129(c)."). The burden of proof that the ALJ

purported to apply in this action was a preponderance of the evidence and the standard of appellate review is the lesser standard of substantial and material evidence. The differing burdens of proof and elements involved make the juvenile court case a different cause of action from that of the DCS administrative case. *See **Clements v. Pearson***, 209 Tenn. 223, 227, 352 S.W.2d 236, 238 (1961)(discussing why acquittal in a criminal case does not bar a later civil action). Accordingly, we hold that Davis's argument that the administrative proceeding was barred by the juvenile court judgment is without merit.

B.

We move now to the question of the sufficiency of the evidence. Before we reach the specifics of the testimony, we note troubling aspects of the ALJ's analysis.

The ALJ, in making her "preponderance of the evidence" evaluation, seems to have been greatly influenced by a principle lifted from a consolidated appeal of a dependency and neglect case and a termination of parental rights case. The ALJ's reference to this principle, in her own words, is as follows:

> The Tennessee Court of Appeals in <u>DCS v. M.P.</u>, 173 S.W.3d 794, 2005 Tenn. App. LEXIS 105, cited a Tennessee statute which recognizes,
>
>> In all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed. Tenn. Code Ann. § 36-1-101(d).

(Underlining in original.) The significance of this principle to the ALJ and her "understanding" of what it means and how she believes it applies to this case are shown by its purposeful insertion in the ALJ's opinion between (1) her discussion of the testimony of Mother and Velez and (2) her discussion of how Davis *must* have touched the Child's "buttocks area." The subject principle, as used in the Court of Appeals' case referenced by the ALJ, comes from an *adoption* statute, Tenn. Code Ann. § 36-1-101(d) (2010). The principle also comes into play in custody cases. *See **Bryan v. Bryan***, 620 S.W.2d 85, 87 (Tenn. Ct. App. 1981) (quoting ***Riddick v. Riddick***, 497 S.W.2d 740, 742 (Tenn. Ct. App. 1973)) ("The rights, desires and interests of the adult parties, parents, grandparents and others

-11-

seeking the custody of small children are relegated to the background and are subordinated to what is considered to be in the best interest of the children."); *see also* **Gaskill v. Gaskill**, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). In both of these two types of cases, *i.e.*, adoption and custody, an adult has a *valid* interest, *i.e.*, a desire to maintain or obtain a status with a child that is recognized by law. In our judgment, the subject principle has absolutely no relevancy to a case where DCS is attempting in an administrative proceeding to prove an individual is "indicated" as the perpetrator of child sexual abuse.

The question remains: how did the ALJ believe this principle is relevant to this case? We suspect, but do not know for sure, that the ALJ thought this principle meant that, in a case involving an alleged act of child abuse, the fact finder was required to tip the balance in favor of the child's story and against the denial of an adult because "[i]n all cases, when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child." **DCS v. M.P.**, 173 S.W.3d 794, 813 (Tenn. Ct. App. 2005). If this is what the ALJ thought, she was incorrect. As we have pointed out, this principle simply recognizes that in adoption and custody cases there is a *valid* interest of an adult that must give way to the best interest of a child.

C.

The ALJ relied upon the following regulation:

(1) A report made against an alleged perpetrator shall be classified as "indicated" if the preponderance of the evidence, in light of the entire record, proves that the individual committed abuse, severe child abuse, child sexual abuse, or neglect. Proof of one or more of the following factors, linking the abusive act(s) to the alleged perpetrator, may constitute a preponderance of the evidence:

(a) Medical and/or psychological information from a licensed physician, medical center, or other treatment professional, that substantiates that physical abuse, sexual abuse, or severe physical abuse occurred;

(b) An admission by the perpetrator;

(c) The statement of a credible witness or witnesses to the abusive or neglectful act;

-12-

(d) The child victim's statement that the abuse occurred;

(e) Physiological indicators or signs of abuse or neglect, including, but not limited to, cuts, bruises, burns, broken bones or medically diagnosed physical conditions;

(f) Physical evidence that could impact the classification decision;

(g) The existence of behavioral patterns that may be indicative of child abuse/neglect and corroborates other evidence of abuse, severe child abuse, child sexual abuse, or neglect should be examined;

(h) The existence of circumstantial evidence linking the alleged perpetrator to the abusive or neglectful act(s) (e.g., child was in care of the alleged perpetrator at the time the abuse occurred and no other reasonable explanation of the cause of the abuse exists in the record).

Tenn. Comp. R. & Regs. ch. 0250-7-9-.05 (2006).

In her findings sustaining the allegations against Davis as "indicated," the ALJ stated:

Validation Factors (a), (b), (c), (e), (f), (g), or (h) were not presented and those Factors are not found to be met.

Validation Factor (d) has been met. The [C]hild victim . . . made credible statements to the [M]other and forensic interviewer who testified at the hearing. . . .

There is a preponderance of the evidence, which establishes that [Davis] committed child sexual abuse involving [the Child].

(Paragraph numbering omitted.)

It is clear to us that the ALJ primarily focused on the "validation factors" of the subject regulation in making her "preponderance of the evidence" evaluation. The ALJ seems to have "mechanically" applied the regulation – focusing as she did on her perception of "consistency" of the Child's stories – rather than focusing on the real issue, *i.e.*, does the

totality of the evidence preponderate in favor of a finding that Davis committed an act that falls within the statutory definition of child abuse. Our conclusion is strengthened by the fact that the ALJ referenced a portion of the "Department of Children's Services Policies" as a basis for her findings, which policies, as pertinent here, focus on whether the statements of the victim are "consistent." The focus of the ALJ's analysis was whether the statements to Mother were consistent with the statements to interviewer Velez. We have previously observed that, in determining whether child sexual abuse has occurred, the fact finder should focus on whether the applicable burden of proof has been met, and be guided by that determination rather than on DCS regulations which purport to define the quantum of proof necessary to prove a case. ***Brown v. State***, No. E2004-01272-COA-R3-CV, 2004 WL 2715283, at *6 (Tenn. Ct. App. E.S., filed Nov. 30, 2004).

D.

Nevertheless, even under the DCS checklist used by the ALJ to sustain the accusation against Davis, there is no substantial and material evidence to support the finding. The one and only "validation factor" present was the Child's story as told to Mother and as told to Velez. The ALJ determined that the two versions were consistent and therefore credible. The ALJ found, however, that one part of the story as related to Mother, *i.e.*, the alleged touching on the front pubic area outside the clothing, was not substantiated for numerous reasons. Since the sole basis for the ALJ's determination is the consistency of the stories, we believe that even one significant inconsistency is a factor that deserved attention and that it fairly detracts from the weight of the testimony that the ALJ credited.

We also note that the forensic interviewer was unable to specify many details. Some lack of detail was related directly to the inadequacy of the story told by the Child. The interviewer testified that the Child was unable to provide some specifics, such as the number of times the alleged abuse occurred or the kind of clothing she was wearing at the time. Other details, such as the names the child used in identifying the body parts that Davis allegedly touched, were missing because the interviewer did not take notes. Since the ALJ's finding is based on the DCS checklist, and the DCS checklist includes the presence of detail as being supportive of abuse, we believe the lack of detail in the forensic examiner's testimony repeating the Child's disclosure also detracts from the evidence that the ALJ credited.

In addition to all the problems with the ALJ's analysis of the evidence that we have noted above, we find the disclosure as related to the forensic interviewer to be patently inconsistent with the disclosure to Mother. According to Mother, the Child disclosed at least five events that, with the one exception of touching in the front outside the clothing, all involved groping of the Child's buttocks under her panties. According to Velez's report

which was introduced as an exhibit to his testimony, *the Child "denied Mr. Davis did anything other than touch her on her thigh.*" Velez testified at the hearing that his report was accurate and complete. He reiterated in his testimony that "[s]he did not" disclose any touching of any body part other than her outer thigh. The Child could not say how many times this sort of touching occurred; only that it happened more than once. There was no cupping of the hand or groping such as described by Mother in the disclosure as related by Velez.

The trial court placed considerable emphasis on the fact that a "demonstration" occurred and that the ALJ saw the demonstration. We are not convinced that such deference to the ALJ's senses is warranted in light of the full record in this case. The ALJ narrated the demonstration on the record as follows:

> . . . It appears . . . that you have demonstrated that the [C]hild showed [Davis's] hand going down through the top of a panty, through the leg portion of a panty, to the outside top of the thigh.
>
> In fact, the very top of the thigh just under the bottom part of a girl's panty leg opening. . . .

Davis's counsel offered the clarification that the touching was "definitely not the side of the waist and not the side of the hip," which the ALJ accepted. This description by counsel is inconsistent with the ALJ's later interpretation of the demonstration as Davis's hand passing across the Child's *buttocks* to reach her thigh. This distinction is important not only for the criterion of "consistency," but also because the ALJ specifically noted that "the outer thigh is not one of the areas of the . . . body set out in the statutory definition of child sexual abuse, [therefore] the mere touching of the [C]hild's outer thigh would not constitute child sexual abuse."

Before concluding our analysis, we think it important to note some of the facts that detract from a finding of sexual abuse. Most of these missing facts fall within the DCS checklist we have previously discussed. The disclosure was made approximately a year after the alleged abuse. No physical evidence, as is often associated with pedophiles, was found. Davis has an impeccable reputation during a lengthy career with troubled youth. The door of Davis's office was never closed or locked. There were no eyewitnesses. As set forth in the interviewer's report, Davis did not tell the Child to keep what had happened a secret. The Child showed no behavioral changes indicative of abuse. At least one professional friend of Mother – to whom the Child spoke – told her the Child was fabricating the story. There were no physical signs of abuse; there was not even a professional examination or counseling session.

-15-

In conclusion, we hold that contrary to the trial court's judgment, the ALJ's findings are not supported by substantial and material evidence. The findings are based solely on the erroneous determination that the disclosure to Velez was consistent with the disclosure to Mother. The disclosures are in fact, inconsistent. There is weighty evidence that no sexual abuse occurred. While our role on review is not to determine the preponderance of the evidence, we think it important in light of the impact upon Mr. Davis to state that the ALJ did not make an appropriate determination of the preponderance of the evidence as an independent fact finder. Rather, the ALJ appears to have erroneously invoked a presumption in favor of the Child and worked though a checklist and erroneously found the presence of one item on the checklist. In short, there is *not* "such relevant evidence as a reasonable mind might accept to . . . furnish a reasonably sound basis for" the ALJ's decision. *See Papachristou*, 29 S.W.3d at 490.

V.

The judgment of the trial court is reversed. Judgment is entered in favor of Eddie Davis. Costs on appeal are taxed to the State of Tennessee Department of Children's Services. This matter is remanded, pursuant to applicable law, for such further proceedings as may be necessary for collection of costs and to give effect to the judgment.

_____<br>CHARLES D. SUSANO, JR., JUDGE