IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 14, 2020 Session

## IN RE TREYLYNN T. ET AL.

**Appeal from the Circuit Court for Henderson County**
**No. 19028-1  Roy B. Morgan, Jr., Judge**

_____

### No. W2019-01585-COA-R3-JV

_____

This is a dependency and neglect case.  Appellee Tennessee Department of Children's Services received a referral of possible child abuse.  Following Appellee's investigation, the children were placed in foster care.  Both parents were arrested on child abuse charges.  Thereafter, Appellee initiated a dependency and neglect action in the juvenile court.  In her criminal case, Appellant/Mother entered a best interest/*Alford* plea to the charge of child endangerment.  Subsequently, the juvenile court found the children dependent and neglected.  On *de novo* review, the trial court found that: (1) Mother's *Alford* plea was dispositive of her guilt on the child endangerment charge; (2) Mother committed severe child abuse under Tennessee Code Annotated section 37-1-102 (b)(27)(C);[1] and (3)  the children were dependent and neglected. Mother appeals. Discerning no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
### Affirmed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., joined.  J. STEVEN STAFFORD, P.J., W.S., filed a dissenting opinion.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, Angel T.[2]

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

---

[1] At the time DCS filed its petition for dependency and neglect, the definition of severe child abuse was found at Tennessee Code Annotated section 27-1-102(b)(22)(C).  For purposes of this appeal, we will cite the current statute, Tennessee Code Annotated section 27-1-102(b)(27)(C).

[2] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

John Andrew Anderson, Lexington, Tennessee, Guardian Ad Litem.[3]

**OPINION**

**I. Background**

Angel T. ("Mother") and Fortrell C. ("Father") are the parents of the minor children, Amelia C. (d.o.b. September 2017) and Treylynn T. (d.o.b. August 2014) (together the "Children").[4] On November 14, 2017, Mother went to work and left Amelia, who was approximately two months old, in Father's sole care. Father later explained that he placed Amelia "in a bumpie with a propped bottle and walked to the kitchen to check on food." When he returned, Father alleged that Amelia was having difficulty breathing and went limp. Father called 911, and Amelia, who by this time was suffering from seizure-like symptoms, was transported to Vanderbilt Children's Hospital. CT and MRI scans revealed that Amelia had bleeding in her brain,[5] and she was hospitalized for three days. While Amelia was in the hospital, Appellee Tennessee Department of Children's Services ("DCS") was notified of her condition. Michelle Stevens, the DCS investigator assigned to the case, interviewed Mother concerning Amelia's injuries. Mother explained that although she did not know the cause of Amelia's injuries, she did not believe Father abused the child.

On or about November 21, 2017, Dr. Elizabeth A. Copenhaver, a Vanderbilt CARE Team physician,[6] completed a medical assessment of Amelia's case. Dr. Copenhaver explained that "Amelia's head imaging [was] concerning for acute bilateral posterial subdural hematomas, acute hematoma layering along the posterior fossa, tentorium and posterior falx as well as subacute hematomas along the frontoparietal convexity." Ultimately, Dr. Copenhaver concluded that "[i]n light of hematomas of various ages and no accidental mechanism of injury for Amelia's brain injuries, I am highly concerned [Amelia's] injuries [were] a result of abusive head trauma . . . ."

On November 28, 2017, both parents were arrested on charges stemming from Amelia's injuries. Mother's indictment charged her with child endangerment, to-wit:

---

[3] The Guardian Ad Litem filed a brief adopting DCS' brief *in toto*.

[4] Father is not a party to this appeal.

[5] During Amelia's birth, she suffered a brain bleed on the top-front portion of her brain. After she was released from the hospital, Amelia showed no adverse symptoms in the following weeks. The CT and MRI scans performed at Vanderbilt on November 14, 2017 show that the injuries, which are the subject of this dependency and neglect case, were not in the same area of her brain as the bleed she experienced at birth.

[6] The CARE Team is a group of clinicians specializing in child trauma and abuse.

[O]n or about November 17, 2017, in Henderson County, Tennessee, and before the finding of this indictment, did unlawfully, knowingly, and intentionally as a parent of a child under eight (8) years of age, to-wit: AM[ELIA] fail to protect such child from abuse or neglect resulting in physical injury or imminent danger to the child, in violation of T.C.A. §39-15-401 . . . .

As referenced in the indictment, Mother was charged under Tennessee Code Annotated section 39-15-401, which provides:

(c)(1) A parent or custodian of a child eight (8) years of age or less commits child endangerment who knowingly exposes such child to or knowingly fails to protect such child from abuse or neglect resulting in physical injury or imminent danger to the child.

(2) For purposes of this subsection (c):

(A) "Imminent danger" means the existence of any condition or practice that could reasonably be expected to cause death or serious bodily injury;

(B) "Knowingly" means the person knew, or should have known upon a reasonable inquiry, that abuse to or neglect of the child would occur which would result in physical injury to the child. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary parent or legal custodian of a child eight (8) years of age or less would exercise under all the circumstances as viewed from the defendant's standpoint; and

(C) "Parent or custodian" means the biological or adoptive parent or any person who has legal custody of the child.

Tenn. Code Ann. §39-15-401(c)(1)-(2)

Following the parents' arrests, the Henderson County Juvenile Court (the "juvenile court") placed the Children in DCS custody. On December 4, 2017, DCS filed a dependency and neglect petition against both parents in the juvenile court. The hearing on DCS' petition was postponed pending resolution of the parents' criminal charges. As is relevant to this appeal, on July 17, 2018, Mother entered a best-interest/*Alford* plea to child endangerment, discussed *infra*. Mother was placed on diversion for eleven months and twenty-nine days.

On January 23, 2019, the juvenile court held an adjudicatory hearing on DCS' petition for dependency and neglect against Mother. By separate orders entered on

March 19, 2019, the juvenile court found the Children dependent and neglected based on severe child abuse by both Mother and Father. Concerning Mother, the juvenile court found:

> The child Amelia [] is a victim of severe abuse by, mother . . . pursuant to T.C.A § 37-1-102 (b)(27)(C) in that the mother failed to protect from the commission of an act prohibited by § 39-15-402.

Mother appealed the juvenile court's ruling to the Henderson County Circuit Court (the "trial court"), which conducted a *de novo* hearing on August 19, 2019. Trial Exhibit 1 consists of Mother's best interest/*Alford* plea to child endangerment and the Henderson County Circuit Court's approval of the eleven-month, twenty-nine day diversion. At trial, Mother testified that she completed her diversion requirements prior to the trial court's hearing and that her record was "clear." Likewise, at oral argument before this Court, Mother's attorney stated that Mother had completed the requirements of her diversion and that the child endangerment charge had been expunged from her record. Tennessee Code Annotated section 40-25-315(b) provides, in part, that

> [u]pon the dismissal of the person and discharge of the proceedings against the person under subsection [i.e., probation/diversion], the person may apply to the court for an order to expunge from all official records . . . all recordation relating to the person's arrest, indictment or information, trial, finding of guilty and dismissal and discharge pursuant to this section . . . .

However, no such order of expungement was presented in the trial court, and no such order appears in the appellate record.

By order of October 15, 2019, the trial court found the Children to be dependent and neglected. In relevant part, the order provides:

> 2. There is finding of guilt of the Mother, based upon her best interest plea to child endangerment under T.C.A. § 39-15-401. The Mother made said plea with no promises of the child(ren) being returned to her custody, as made clear by the requirements outlined in the Mother's best interest plea documentation. The conviction for child endangerment includes a "knowingly" element; specifically[,] that the Mother, "knowingly fails to protect such child from abuse or neglect. . . ."

> ***

> 4. The Mother knowingly failed to protect the child.

> ***

- 4 -

The Court finds by clear and convincing evidence that the child, Amelia [C.], suffered from abuse and/or neglect and therefore pursuant to T.C.A. § 37-1-129([b])(2) finds that the child is a victim of severe child abuse as defined at T.C.A. § 37-1-102(b)(2[7])(C), perpetrated by the Mother, Angel [T.].

Mother appeals.

## II. Issues

As set out in her brief, Mother's raises the following issue for review:

Whether the Circuit Court Henderson County, Tennessee erred in upholding the findings of the Juvenile Court of Henderson County, Tennessee when (1) the state failed to present clear and convincing evidence, (2) it erroneously relied upon [Mother's] best interest plea, and (3) the conditions that may have existed at the time the Dependency and Neglect Petition was filed no longer existed at the time of the de novo hearing.

## III. Standard of Review

As very recently explained by this Court:

A child who is suffering from abuse is a dependent and neglected child. *See* Tenn. Code Ann. § 37-1-102[(b)](1[3])(G). A determination that a child is dependent and neglected must be supported by clear and convincing evidence. *See* Tenn. Code Ann. § 37-1-129(a)(1) & (c). Severe child abuse in a dependency and neglect proceeding must also be established by clear and convincing evidence. ***In re S.J.***, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012).

The "clear and convincing evidence standard" is more exacting than the "preponderance of the evidence" standard, although it does not demand the certainty required by the "beyond a reasonable doubt" standard. ***In re C.W.W.***, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). The clear and convincing evidence standard defies precise definition. ***Majors v. Smith***, 776 S.W.2d 538, 540 (Tenn. Ct. App. 1989). Evidence satisfying this high standard produces a firm belief or conviction regarding the truth of facts sought to be established. ***In re C.W.W.***, 37 S.W.3d at 474. Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. ***Hodges***

***v. S.C. Toof & Co.***, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992).

Our review of the trial court's determinations on questions of fact is de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Whether a child has been proven dependent and neglected by clear and convincing evidence is a question of law which we review de novo without a presumption of correctness. ***In re H.L.F.***, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009). To the extent the trial court's determinations rest upon an assessment of the credibility of witnesses, the determinations will not be overturned absent clear and convincing evidence to the contrary. ***Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999).

***In Re Zaliyah S., et al.***, No. M2019-01241-COA-R3-JV, 2020 WL 3494471 (Tenn. Ct. App. June 26, 2020) (citing ***In re M.D.***, No. M2015-01023-COA-R3-JV, 2016 WL 5723954, at *3-4 (Tenn. Ct. App. Sept. 30, 2016) (quoting ***In re Kaitlynne D.***, No. M2013-00546-COA-R3-JV, 2014 WL 2168515, at *1-2 (Tenn. Ct. App. May 21, 2014)).

Furthermore, to the extent that Appellant's issues require interpretation of the dependency and neglect statutes, we are guided by the familiar rules of statutory construction. "The most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." ***Owens v. State***, 908 S.W.2d 923, 926 (Tenn. 1995) (citing ***State v. Sliger***, 846 S.W.2d 262, 263 (Tenn. 1993)). "The text of the statute is of primary importance." ***Mills v. Fulmarque***, 360 S.W.3d 362, 368 (Tenn. 2012). A statute should be read naturally and reasonably, with the presumption that the legislature says what it means and means what it says. *See **BellSouth Telecomm'ns., Inc. v. Greer***, 972 S.W.2d 663, 673 (Tenn.Ct.App.1997).

Statutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both. "[T]he construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute." ***Graham v. Caples***, 325 S.W.3d 578, 582 (Tenn. 2010) (quoting ***Wilson v. Johnson Cnty.***, 879 S.W.2d 807, 809 (Tenn. 1994)). We seek to adopt the most "reasonable construction which avoids statutory conflict and provides for harmonious operation of the laws." ***Carver v. Citizen Utils. Co.,*** 954 S.W.2d 34, 35 (Tenn. 1997). Issues of statutory interpretation present a question of law, which we review *de novo* on appeal, giving no deference to the trial court's decision. ***Mills***, 360 S.W.3d at 366; ***Lind v. Beaman Dodge, Inc.***, 356 S.W.3d 889, 895 (Tenn.2011).

## IV. Analysis

The trial court held that the Children were dependent and neglected based on severe child abuse perpetrated by Mother and Father. As set out in context above, the trial court specifically determined that Mother committed severe child abuse under the definition set out at Tennessee Code Annotated section 37-1-102(b)(27)(C), which provides, in relevant part:

(27) "Severe child abuse" means:

***

(C) The commission of any act towards the child prohibited by . . . § 39-15-402 . . . or the knowing failure to protect the child from the commission of any such act towards the child;

Under this definition, Mother may be found to have committed severe child abuse on one of two alternate theories. First, DCS may prove, by clear and convincing proof, that Mother "commi[ted] an act toward the child prohibited by [] §39-15-402." Alternatively, DCS may show, by clear and convincing proof, that Mother "knowing[ly] fail[ed] to protect the child from the commission of any such act [(i.e., an act prohibited in §39-15-402)] towards the child.

Tennessee Code Annotated section 39-15-402 provides:

(a) A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); **or child endangerment, as defined in § 39-15-401(c)** and:

(1) The act of abuse, neglect or endangerment results in serious bodily injury to the child;

(Emphasis added). Accordingly, to show that Mother committed severe child abuse under section 37-1-102(b)(27)(C), DCS must prove, under section 39-15-402, that: (1) Mother committed the offense of child endangerment as defined in section 39-15-401(c); and (2) Mother's act of child endangerment "result[ed] in serious bodily injury to the child." As explained in Tennessee Code Annotated section 37-1-102(b)(27)(A)(ii), "'Serious bodily injury' shall have the same meaning given in § 39-15-402(c)." Tennessee Code Annotated section 39-15-402(c) defines "serious bodily injury to the child" to include "subdural or subarachnoid bleeding . . . cerebral edema, [or] brain contusion . . . ." If a child is the victim of severe child abuse, she is dependent and neglected. Tenn. Code Ann. § 37-1-102(b)(13)(G).

As noted above, both parents were criminally charged in connection with Amelia's injuries. Although Father is not a party to this appeal, in its October 15, 2019 order, the trial court noted that, "There is an admission by the natural father . . . of guilt by pleading guilty to aggravated child abuse under T.C.A. § 39-15-402." Mother does not dispute this finding; therefore, for purposes of this appeal, it is undisputed that Father pled guilty to an offense prohibited by Tennessee Code Annotated section 39-25-402. Mother was charged with child endangerment under Tennessee Code Annotated section 39-15-401(c), and it is undisputed that Mother entered a best interest/*Alford* plea to the charge. The question, then, is whether Mother's *Alford* plea to child endangerment, where the child was a victim of aggravated child abuse, satisfies the requirement for severe child abuse contemplated under the section 37-1-102(b)(27)(C) definition, *supra*. Before addressing this question, we first discuss the nature and consequences of a best interest/*Alford* plea.

A criminal defendant may plead guilty pursuant to a "best interest" plea as set forth in ***North Carolina v. Alford***, 400 U.S. 25 (1970). In such case, the defendant pleads guilty while maintaining her factual innocence of the crime. *See **State v. Albright***, 564 S.W.3d 809, 817, n. 5 (Tenn. 2018), *cert. denied*, 139 S. Ct. 2746, 204 L. Ed. 2d 1134 (2019). As explained by the Tennessee Supreme Court in ***Albright***, an *Alford* plea differs from a *nolo contendere* plea in that an *Alford* plea may be used as an admission of guilt in a subsequent civil proceeding, to-wit:

> As we noted in ***Frazier v. State***, 495 S.W.3d 246, 250 n.1 (Tenn. 2016), a criminal defendant may plead guilty pursuant to a "best interest" plea as set forth in the United States Supreme Court case, ***North Carolina v. Alford***, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Frequently referred to as an "Alford plea," the defendant pleads guilty while maintaining his factual innocence of the crime. Although we noted in ***Frazier*** that our Rules of Criminal Procedure refer to *Alford* pleas as *nolo contendere* pleas, 495 S.W.3d at 250 n.1, we take this opportunity to clarify that there are technical differences between a "best interest"/*Alford* plea and a *nolo contendere* plea. Specifically, because "best interest"/*Alford* pleas are guilty pleas even though the defendant is protesting his innocence, a factual basis must be established on the record at the plea hearing before the trial court may accept the plea. *See **Alford***, 400 U.S. at 37, 38 n.10, 91 S.Ct. 160; ***Dortch v. State***, 705 S.W.2d 687, 689 (Tenn. Crim. App. 1985). No such factual basis is required for *nolo contendere* pleas. ***State v. Crowe***, 168 S.W.3d 731, 747 (Tenn. 2005). Additionally, a defendant entering a "best interest"/*Alford* plea may be estopped from denying his guilt in a subsequent civil action, *see*, *e.g.*, Stephanos Bibas, Harmonizing Substantive-Criminal-Law Values and Criminal Procedure: The Case of Alford and Nolo Contendere Pleas, 88 Cornell L. Rev. 1361, 1373 (July 2003), while a defendant pleading nolo contendere is not subject to estoppel, *see, e.g.*, ***Teague v. State***, 772 S.W.2d 932, 943 (Tenn. Crim.

App. 1988); *see also* Tenn. R. Evid. 410(2). Nevertheless, as the United States Supreme Court recognized in ***Alford***, there is no "material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence[.]" ***Alford***, 400 U.S. at 37, 91 S.Ct. 160; *see also, e.g., **State v. Faraday***, 268 Conn. 174, 842 A.2d 567, 588 n.17 (2004) ("A guilty plea under the *Alford* doctrine is . . . the functional equivalent [to an unconditional] plea of nolo contendere which itself has the same legal effect as a plea of guilty on all further proceedings within the indictment. . . . The only practical difference is that the plea of nolo contendere may not be used against the defendant as an admission in a subsequent criminal or civil case.") (internal quotation marks and citations omitted); ***Bibas***, *supra* ("*Alford* and *nolo contendere* pleas differ in two main ways: First, *nolo contendere* pleas avoid estoppel in later civil litigation, while *Alford* pleas do not. Second, defendants who plead *nolo contendere* simply refuse to admit guilt, while defendants making *Alford* pleas affirmatively protest their innocence. By and large, however, *Alford* is a new extension of the age-old *nolo* plea.").

***Albright***, 564 S.W.3d at 817 n.5. To the extent Mother argues that the *Alford* plea in her criminal case was the result of bad advice or inadequate assistance of counsel, these arguments are within the jurisdiction of the criminal courts on a petition for post-judgment relief and, as such, are beyond the scope of our review in this dependency and neglect case. Mother further contends that her *Alford* plea is not dispositive of whether the Children are still dependent and neglected, in that her circumstances changed from the time the Children were removed from her custody to the date of the *de novo* hearing, and the trial court did not consider those positive changes in reaching its decision. As set out in her brief, Mother contends that,

> [b]y the time of the de novo hearing she had successfully completed diversion and, as requested by DCS, completely removed [Father] from her life, secured a new residence and a new job. Nonetheless, and based in large part on [Mother's] best interest plea, the Circuit Court upheld the findings of the Henderson County Juvenile Court . . . .

From her appellate brief, Mother's argument is two-fold. Mother first asserts that the trial court failed to conduct a true *de novo* hearing in violation of ***In re Alysia M.S.***, No. M2011-02008-COA-R3-JV, 2013 WL 1501710 (Tenn. Ct. App. April 11, 2013). In *Alysia M.S.*, this Court clarified that

> in a dependency and neglect case, the circuit court is to hear any appeal from the juvenile court, and in so doing, "shall hear the testimony of witnesses and try the case de novo." Tenn. Code Ann. § 37-1-159(a). On appeal, the entire juvenile court record must be provided to the circuit

court, Tenn. Code Ann. § 37-1-159(c), but the circuit court may not rely solely on that record; rather, in trying the case de novo, the circuit court must "render[ ] an independent decision based on the evidence received in the circuit court proceeding." *In re M.J.B.*, 140 S.W.3d at 651.

*In re Alysia M.S.*, 2013 WL 1501710, at \*5. Mother contends that the trial court relied solely on the juvenile court record (specifically her *Alford* plea) and did not consider new evidence. Mother cites the trial court's comment that

> one of the issues that troubled me in the beginning and before you came today as I read the brief is the time period that the Court is to consider, and I've given that some thought prior to today, and, of course, hearing argument today and listening to the case, I believe in my mind that I have to look back in time to when these allegations were first raised . . . .

In the first instance, the holding in *Alysia M.S.* does not preclude the trial court, in a *de novo* hearing, from reviewing the juvenile court record. However, the "circuit court may not rely **solely** on that record . . . ." *In re Alysia M.S.*, 2013 WL 1501710, at \*5 (emphasis added). So, while the circuit court may consider the juvenile court record, it must "render[ ] an independent decision based on the evidence received in the circuit court proceeding." Here, the trial court did, in fact, receive evidence at the August 19, 2019 hearing. Exhibit 1, which was admitted without objection, contained Mother's *Alford* plea and the order for diversion. Exhibit 2 was a collection of photographs of Mother's home. Mother stated that she took the photographs "[a]bout a week ago, two weeks ago;" accordingly, these photographs constitute evidence that was not presented in the juvenile court's record. Furthermore, the trial court heard new testimony at the August 19, 2019 hearing. Specifically, Mother testified that she no longer had contact with Father at that time. In addition, Mother testified concerning the changes and progress she had made after the juvenile court's adjudication of dependency and neglect, including passing drug screens and completing parenting classes. In fact, Mother stated that she had completed all requirements of her diversion, to-wit:

> Q. You've completed your probation on that charge [i.e., child endangerment]?
> A. Yes.
> Q. And the diversion kicked in, and your record as far as you're aware is completely clean.
> A. It's clear . . . .

The trial court also heard testimony from Carla T., Mother's sister-in-law, who corroborated Mother's testimony that she no longer had contact with Father. Additionally, the trial court considered the medical records and findings that were compiled by the Vanderbilt Care Team, which records were admitted into evidence as

- 10 -

Exhibit 5. The trial court further considered the deposition testimony of Dr. Lisa Piercey, who opined that the most common cause of subdural hematoma like Amelia sustained is from inflicted head trauma. Thus, from the record, it is clear that the trial court heard new evidence and conducted a procedurally sound *de novo* hearing in reaching its decision.

Nonetheless, Mother argues that the trial court based its finding of dependency and neglect solely on her *Alford* plea and failed to consider the facts as they existed at the time of the *de novo* hearing. In support of her argument that the trial court failed to consider the positive changes she made during the pendency of the case, i.e., failed to consider the circumstances existing at the time of the de novo hearing as opposed to the circumstances that precipitated the juvenile court's adjudication of dependency and neglect, i.e., Mother's *Alford* plea, Mother cites this Court's opinion in *In re Landon H.*, No. M2014-01608-COA-R3-JV, 2016 WL 762741 (Tenn. Ct. App. Feb. 25, 2016). In *Landon H.*, the grandmother and father of the minor child filed petitions in the juvenile court alleging that the child was dependent and neglected based on mother's drug use and criminal activity. *Id.* at *3-7. In the juvenile court proceedings, mother stipulated that the minor child was dependent and neglected, and the juvenile court so found. *Id.* at *7. Mother then appealed to the circuit court for *de novo* hearing. *Id.* at *8. In the circuit court, mother stipulated that the child was dependent and neglected as of the date the petition was filed; the circuit court accepted the stipulation and found the child dependent and neglected. *Id.* On review, this Court vacated the trial court's finding of dependency and neglect and specifically held that:

> The circuit court failed to independently determine whether Landon was dependent and neglected at the time of the hearing. If the conditions of dependency and neglect do not exist at the time of the hearing, the circuit court must dismiss the petition. *Green* [*v. Green*, No. M2007-01263-COA-R3-CV,] 2009 WL 348289, at *4 [(Tenn. Ct. App. Feb. 11, 2009), *perm. app. denied* (Tenn. Aug. 24, 2009)]. *See also In re K.A.P.*, 2013 WL 6665012, at *7 (holding the evidence of mother's past behavior was not sufficient to find son dependent and neglected); *In re Alysia M.S.*, 2013 WL 1501710, at *8 (affirming circuit court's decision to dismiss petition when conditions existing at time of the juvenile court hearing were no longer present at de novo trial).

2016 WL 762741, at *6. Mother also cites *Green v. Green*, No. M2007-01263-COA-R3-CV, 2009 WL 348289 (Tenn. Ct. App. Feb. 11, 2009), *perm. app. denied* (Tenn. Aug. 24, 2009) for the same proposition. We agree with Mother that *Green* and *Landon H.* require a trial court to consider the evidence and circumstances as they exist at the time of the *de novo* hearing on dependency and neglect. However, as noted above, at the August 19, 2019 hearing, Mother's *Alford* plea was entered into evidence without objection. Although Mother testified that her record was "clear," she did not offer either an order of

expungement, or an order showing that she successfully completed diversion. While we render no opinion as to whether such orders would negate the *Alford* plea for purposes of Mother's civil case, in the absence of such orders, the trial court did not err in considering the *Alford* plea as admitted in Trial Exhibit 1. In other words, from the evidence, the *Alford* plea existed at the time of the *de novo* hearing, and Mother provided no countervailing evidence that it did not. Nonetheless, neither expungement nor successful completion of diversion would erase the underlying conduct that caused Amelia's injuries.

We conclude that **Landon H.** is distinguishable from the instant appeal in that **Landon H**. did not involve an *Alford* plea. Rather, in **Landon H.**, mother *stipulated* that there was sufficient evidence to support a finding of dependency and neglect at the time the petition was filed two years earlier. Without further proof on the issue of dependency and neglect, the **Landon** trial court focused solely on placement of the child. Also, **Landon** involved a mother not taking full responsibility for her child; she left the child with her parents, where she lived infrequently, due to her drug use. Furthermore, in **Landon H.**, there was no evidence that the child suffered any injury as a result of mother's conduct or drug use. Unlike **Landon H.**, in this case, Amelia suffered severe and life threatening injuries as a result of Mother's commission of child endangerment or, alternately, as a result of Mother's failure to protect Amelia from Father's abuse. These facts distinguish the instant case from **Landon H.** So, while we acknowledge that Mother made some positive changes since the outset of this case, her *Alford* plea remained in effect at the time of the *de novo* hearing in the trial court (and to date), and the fact of Amelia's egregious injuries remains a constant in this case. Under **Albright**, and for the reasons discussed in detail above, Mother's *Alford* plea is dispositive of her commission of the offense of child endangerment as defined at Tennessee Code Annotated section 39-15-401(c), and the trial court did not err in considering that plea, along with other evidence, in reaching its decision that the Children were dependent and neglected at the time of the *de novo* hearing.

Returning to the elements of severe child abuse, we begin with the section 37-1-102(b)(27)(C), which defines knowing failure to protect a child. Again, it is undisputed that Father committed aggravated child abuse under Tennessee Code Annotated section 39-15-402. By entering an *Alford* plea on the charge of child endangerment, Mother admitted guilt to each element of that offense. As set out in context above, child endangerment occurs when a person "knowingly exposes [the] child to or knowingly fails to protect [the] child from abuse or neglect resulting in physical injury or imminent danger to the child." So, by her *Alford* plea, Mother is guilty of failing to protect Amelia from Father's perpetration of aggravated child abuse under Tennessee Code Annotated section 39-15-402. As such, Mother, may be found to have committed severe child abuse by her "knowing failure to protect the child from the commission of" aggravated child abuse by Father. Tenn. Code Ann. § 37-1-102(b)(27)(C).

Notwithstanding Father's guilt, Mother's *Alford* plea resulted in her admission that

she "commit[ed] the offense of . . . child endangerment, as defined in § 39-15-401(c)." This admission satisfies the first criterion under section 39-15-402, i.e., that "[a] person commits the offense . . . of child endangerment, as defined in §39-15-401(c)." Turning to the second criterion under the section 39-15-402, i.e., that the endangerment resulted in serious bodily injury to the child, Mother argues that the proof concerning the cause of Amelia's brain injuries is speculative and, as such, does not satisfy the clear and convincing standard. In the first instance, as explained by this Court in *In re S.J.*, 387 S.W.3d 576, 591-92 (Tenn. Ct. App. 2012):

> Under the clear and convincing evidence standard, it is important to "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007).
> Each specific underlying fact need only be established by a preponderance of the evidence. Such specific underlying facts include whether a particular injury suffered by the child was the result of nonaccidental trauma, and whether the caregiver's conduct with respect to the injury was "knowing." Once these specific underlying facts are established by a preponderance of the evidence, the court must step back to look at the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse.

Turning to the record, according to Dr. Copenhaver's assessment, in addition to Amelia's brain injury that immediately preceded her treatment at Vanderbilt, the child's MRI showed "hematomas of various ages and no accidental mechanism of injury for Amelia's brain injuries." In other words, Dr. Copenhaver opined that Amelia suffered several brain hematomas over a period of time, which made Dr. Copenhaver "highly concerned [that] [Amelia's] injuries [were] a result of abusive head trauma." As set out in Amelia's medical records, which were admitted into evidence as Trial Exhibit 5, Dr. Copenhaver opined that Amelia "[was] not developmentally capable to cause these injuries herself," that the injuries were not a result of birth trauma or a "medical cause," and that there was "no accidental mechanism" for Amelia's injuries. So, it appears from the evidence, that the brain bleed that gave rise to the instant case was not the first or only injury suffered by this child while in her parents' care and custody. Dr. Copenhaven's assessment and the child's medical records would seem to indicate that Amelia was the victim of ongoing abuse as opposed to an isolated accident.

Dr. Copenhaver's assessment was corroborated by DCS's medical expert, Dr. Lisa Piercey. Dr. Piercey's evidentiary deposition was admitted as Trial Exhibit 4. Like Dr. Copenhaver, Dr. Piercey stated that Amelia's injuries were concerning for non-accidental head trauma. She explained that for infants like Amelia, "the most common cause of subdural hematoma is inflicted head trauma," and she testified that whatever caused the most recent subdural hematoma "almost certainly took place in the minutes to an hour or

so prior to the onset of symptoms" (i.e., seizure-like symptoms). It is undisputed that on the day of the incident, Amelia had been in the care of only Mother and Father and that she was alone with Father when she began exhibiting seizure-like symptoms. Thus, according to Dr. Piercey's testimony, the cause of Amelia's subdural hematoma occurred while she was in the care of either Father, Mother, or both.

Although Dr. Piercey also testified that a subdural hematoma can be caused by certain medical conditions—specifically, central venous sinus thrombosis; an infection like meningitis or encephalitis; or a metabolic disorder—this testimony does not preclude a finding that Amelia's subdural hematoma was caused by non-accidental trauma. First, the record indicates that Amelia's subdural hematoma likely was not caused by the medical conditions identified by Dr. Piercey. The medical records reflect that Amelia underwent an "Infection/Metabolic" assessment and that the results were within normal limits. Furthermore, although Amelia's MRI revealed "evidence of thrombosis cortical veins at the frontoparietal vertex [(i.e., the site of Amelia's birth injury, *see supra* fn. 4)]," Dr. Piercey noted that it is "rare" for the thrombosis to cause the smaller veins "to pop and bleed." Mother asserts that Dr. Piercey "could not conclude within a reasonable degree of medical certainty that Amelia's injuries were caused by abusive or non-accidental head trauma." However, as discussed above, non-accidental trauma need only be established by a preponderance of the evidence—a "reasonable degree of medical certainty" is not required. *In re S.J.*, 387 S.W.3d at 592.[7] Indeed, this Court has held that "[t]o support a factual finding of non-accidental trauma, the expert testimony need not exclude every other conceivable possibility." *Id*. at 594.

From the uncontested testimonies of Drs. Copenhaver and Piercey, the preponderance of the evidence supports the underlying fact that Amelia's brain injuries were the result of non-accidental trauma and were of the type of injuries that constitute serious bodily injury, i.e., "subdural or subarachnoid bleeding . . . cerebral edema, [or] brain contusion . . . ." Tenn. Code Ann. §39-15-402(c). From the cumulative facts, there is clear and convincing evidence that Amelia's injuries resulted from Mother's act of child endangerment. Accordingly, both criteria under section 39-15-402 are met, i.e., Mother committed child endangerment, and Amelia suffered serious bodily injury as a result. In summary, there is sufficient evidence to support the trial court's finding that Mother committed severe child abuse under section 37-1-102(b)(27)(C).

As a point of clarification, although we have focused our analysis on the injuries suffered by Amelia, the trial court held that both Amelia and Treylynn were dependent and neglected as a result of severe child abuse. While Amelia is a dependent and

---

[7] This Court has held that expert testimony is not required to find severe child abuse under Tennessee Code Annotated section 37-1-102(b)(27)(C). *State Dep't of Children's Servs. v. M.P.*, 173 S.W.3d 794, 804 (Tenn. Ct. App. 2005) (noting that § 37-1-102(b)(27)(C) "does not require expert testimony").

- 14 -

neglected child under Tennessee Code Annotated section 37-1-102(b)(13)(G) (stating that an abused child is a dependent and neglected child), Tennessee Code Annotated section 37-1-102(b)(13)(F) further defines a dependent and neglected child as one "[w]ho is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others." Tennessee Courts have applied this definition to children who are not, themselves, the victims of abuse, but whose parents perpetrate abuse on another child in the parent's care. In such cases, we have concluded that a parent who is found to have severely abused one of her children supports the conclusion that the other children remaining in her custody are in danger of being subjected to similar abuse and, therefore, that they are dependent and neglected under Tennessee Code Annotated section § 37-1-102(b)(13)(F). *See, e.g., **In re S.J.**,* 387 S.W.3d at 589-90 ("It would be anomalous indeed if DCS, after finding one child in a household had suffered abuse and neglect, was powerless under the dependency and neglect statutes to remove other children in the household."); **In re Shyronne H.**, No. W2012-02188-COA-R3-PT, 2013 WL 1804206, at *1 (Tenn. Ct. App. April 30, 2013), *perm. app. denied* (Tenn. June 19, 2013). Having affirmed the trial court's determination that Amelia is the victim of severe child abuse and, as such, is dependent and neglected, we also affirm the trial court's conclusion that Treylynn is a dependent and neglected child under Tennessee Code Annotated section 37-1-102(b)(13)(F).

Finally, we briefly address the dissent. The dissent rests on the sole premise that Mother successfully completed the requirements of her diversion, which resulted in dismissal of the child endangerment charge (i.e., no conviction). In support of this premise, the dissent relies on the trial court's oral statements following the close of proof at the hearing. Therein, the trial court speculates that there is an order evincing Mother's completion of diversion, i.e., "I take it the proper order has been signed and she's completed all [requirements of her diversion] based on her testimony . . . ." As previously noted, the record contains neither an order of expungement, nor an order evincing Mother's alleged completion of diversion. Regardless, it is well settled that "the court speaks through its order[s] not through the transcript." **In re Adoption of E.N.R.**, 42 S.W.3d 26, 31 (Tenn. 2001); **Palmer v. Palmer**, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1977). "A judgment must be reduced to writing in order to be valid. It is inchoate, and has no force whatever, until it has been reduced to writing and entered on the minutes of the court, and is completely within the power of the judge or Chancellor." **Broadway Motor Co. v. Pub. Fire Ins. Co**., 12 Tenn. App. 278, 280 (1930). "We do not review the court's oral statements, unless incorporated in a decree, but review the court's order and judgments for that is how a Court speaks." **Steppach v. Thomas**, 346 S.W.3d 488, 522 (Tenn. Ct. App. 2011) (quoting **Shelby v. Shelby**, 696 S.W.2d 360, 361 (Tenn. Ct. App. 1985)). So, while the dissent couches the trial court's oral statement as a finding, it is not. Rather, as noted in the dissent, the trial court's ultimate conclusion, as set out in its written order, was that "[M]other had been 'convicted' of child endangerment." This is the finding of the court and the starting point of our review.

The only proof in the record concerning the question of whether Mother

successfully completed her diversion is her own testimony. At several points in her testimony, Mother states that she satisfied the requirements of her diversion; however, there are also points in her testimony where she contradicts that claim. For example:

> Q [to Mother]. Okay. And have you satisfied all of those requirements [of your diversion] at this time?
>
> A. Yes, ma'am.
>
> Q. And have you been submitting to random drug screens?
>
> A. Yes, ma'am.
>
> Q. Have you passed all your random drug screens?
>
> A. All of them besides the one that they said for the nail bed.
>
> Q. And what was the result of that drug screen?
>
> A. They said that I failed that one. I took the hair follicle and the nail bed test in the same week. They said I passed one and failed the other.
>
> Q. Okay. And what did you fail for?
>
> A. They said it was for methamphetamines.

So, while the trial court initially opined (in its oral statement) that Mother successfully completed diversion, there was no order corroborating her testimony concerning the completion of diversion. In view of Mother's testimony concerning a failed drug screen during the term of her diversion, and in the absence of any other evidence concerning whether she completed diversion, we cannot conclude that Mother's charge of child endangerment was successfully discharged or dismissed as argued in the dissent. Because the dissent is premised on an unproven fact, i.e., that Mother successfully completed the requirements of her diversion, the analysis is not applicable in this case and, as such, is advisory. *Island Properties Associates v. The Reaves Firm, Inc., d/b/a Reaves, Sweeney, and Marcum, et al.*, 413 S.W.3d 392, 402 (Tenn. Ct. App. 2013) (citing *Third Nat'l Bank v. Carver*, 218 S.W.2d 66, 69 (Tenn. Ct. App. 1948)), *perm. app. denied* (Tenn. June 13, 2013) ("It is not the purview of this Court to engage in the rendering of advisory opinions on hypothetical facts.").

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to Appellant, Angel T. Because Angel T. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE